Monica Kay LASATER, Appellant–Respondent,

v.

William Scott LASATER, Appellee–Petitioner.

No. 02A05–0303–CV–102.

Court of Appeals of Indiana.

May 27, 2004.

Judith L. Fox, Notre Dame Legal Aid Clinic, Notre Dame, IN, Attorney for Appellant.

Charles F. Leonard, Tremper Bechert Leonard & Terrill, Fort Wayne, IN, Attorney for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Monica Lasater challenges the trial court's order granting to her ex-husband, William, custody of their daughter, C.L., and limiting her visitation with the child. We affirm.

### Issues

Monica raises four issues for our review, which we restate as:

I. whether the trial court abused its discretion when it found her in contempt of court;

II. whether she was deprived of due process;

III. whether the trial court's findings are clearly erroneous; and

IV. whether the trial court erroneously restricted her visitation.

We also address inflammatory and inappropriate comments contained in Monica's brief.

### Facts

This case has a complicated procedural history, which is necessary to recount in part as a context for the issues before us. William and Monica married in March 1993. Shortly thereafter, Monica had C.L. After residing in Tennessee and Ohio, the parties settled in Fort Wayne in 1997.

During the time the parties resided in Ohio, C.L. allegedly reported to Monica that William had touched her inappropriately. Monica and William later sought marital counseling, which was ultimately unsuccessful. On April 13, 1998, William filed a petition for dissolution of marriage in the Allen County Superior Court before Judge Felts.

Monica filed a motion for change of venue from judge. A three-judge panel was presented, and each party struck one judge. On June 3, 1998, Judge Charles Pratt was appointed as Special Judge of the Allen County Circuit Court and assumed jurisdiction. In January 1999, Karen Richards became Monica's second attorney, but she withdrew in July and was replaced by Monica's third attorney. During the fall of 1999, the trial court issued various provisional orders.

In January 2000, Monica's fourth attorney appeared on her behalf. The trial court set the matter for trial to commence on September 29, 2000. On September 7, 2000, a letter was directed to counsel regarding "ethical disclosures by special judge." Appellant's App. Vol. I, p. 4. Shortly thereafter, Monica filed a motion seeking the recusal of Judge Pratt, and Judge Pratt later recused.

On October 31, 2000, this matter was transferred to Judge Stephen Sims in the Allen County Superior Court. Monica filed a motion to disqualify Judge Sims on the grounds that he was improperly appointed and that William's counsel had worked on his judicial campaign. The motion was denied on March 1, 2001. Thereafter, Monica's counsel filed a motion to withdraw, which was granted on July 12, 2001.

On August 1, 2001, the trial court received an order from our supreme court dismissing the Petition for Writ of Prohibition, Emergency Petition for Writ of Prohibition, and Writ of Mandamus filed by Monica with the supreme court. On Au-

gust 8, 2001, Judge Sims recused himself, appointed a guardian ad litem, appointed an attorney for Monica, and referred the matter to the supreme court for purposes of appointing a special judge. Our supreme court appointed Judge Frederick Schurger as special judge in October 2001. On November 2, 2001, the attorney appointed by the trial court for Monica filed a notice of inability to serve, and another attorney appeared as counsel for her shortly after. In March 2002, the trial court appointed yet another attorney as pauper counsel for Monica.

During the course of that year, the trial court conducted pre-trial conferences and issued several pre-trial orders involving discovery issues. The trial court conducted a ten-day bench trial from January 27, 2003, to February 7, 2003. At the commencement of trial, Monica filed a letter attempting to discharge her court appointed attorney, and she proceeded with the trial pro se.[1] On March 7, 2003, the trial court issued an order granting the dissolution, awarding full custody of C.L. to William, prohibiting visitation between Monica and C.L. for a period of ninety days, and providing for supervised visitation thereafter. The trial court also found Monica to be in contempt of court and ordered her to pay $2,100. Monica now appeals.[2]

### Analysis

#### I. Contempt

There are essentially two components to Monica's challenge to the trial court's finding of contempt. First, she argues that there were procedural irregularities because the trial court did not conduct a rule to show cause hearing pursuant to Indiana Code Section 34–47–3–5. Second, she challenges the substance of the contempt citation on the basis that she did comply with the trial court's orders and that she cannot be held in contempt for violating the "spirit" of the orders. We address each challenge.

First, Monica claims that the trial court failed to conduct a rule to show cause hearing and, as a result, her due process rights were violated. Indiana Code Section 34–47–3–5 provides in relevant part:

(a) In all cases of indirect contempt, the person charged with indirect contempt is entitled:

(1) before answering the charge; or

(2) being punished for the contempt;

to be served with a rule of the court against which the contempt was alleged to have been committed.

(b) The rule to show cause must:

(1) clearly and distinctly set forth the facts that are alleged to constitute the contempt;

(2) specify the time and place of the facts with reasonable certainty, as to inform the defendant of the nature and circumstances of the charge against the defendant; and

(3) specify a time and place at which the defendant is required to show cause, in the court, why the defendant should not be attached and punished for such contempt.

On January 6, 2003, William filed a petition for finding of contempt in two counts. The petition was several pages long and

---

1. The trial court did not permit Monica to discharge her counsel entirely and ordered counsel to remain in the courtroom during the trial for advisory purposes.

2. On January 25, 2003, Monica filed a pro se interlocutory appeal challenging several pre-trial orders that she claimed prevented her from presenting witnesses at the trial. On our motion, we consolidated that appeal with the one from the final order.

detailed the allegations of contempt. Monica was served with the petition. A few days later, the trial court issued an order setting the petition for hearing before the trial previously scheduled for January 27, 2003. During the hearing, the parties presented evidence on the allegations contained in the contempt petition.

It is true that the trial court did not conduct a separate rule to show cause hearing regarding the contempt petition. However, we are satisfied that Monica's due process rights were protected. She was advised in detail of the allegations of contempt William alleged in the petition and had ample opportunity both to present her own evidence regarding the allegations and to question William's evidence. Furthermore, Monica does not claim that she was prejudiced in any way by the trial court's decision to hold the evidentiary hearing on the contempt petition without first having the rule to show cause hearing. Based on the complexity of this case and the amount of evidence presented by the parties on the contempt allegations and the other issues for trial, it was both reasonable and efficient for the trial court to combine the hearings during a time that was already scheduled for them.

■ Second, Monica challenges the substantive merits of the contempt citation. "Whether a person is in contempt of a court order is a matter left to the trial court's discretion." *Mitchell v. Mitchell,* 785 N.E.2d 1194, 1198 (Ind.Ct.App.2003). We will reverse the trial court's finding of contempt only where an abuse of discretion has been shown, which occurs only when the trial court's decision is against the logic and effect of the facts and circumstances before it. *Id.* When we review a contempt order, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id.*

■ "Contempt of court involves disobedience of a court which undermines the court's authority, justice, and dignity." *Srivastava v. Indianapolis Hebrew Congregation, Inc.,* 779 N.E.2d 52, 60 (Ind.Ct. App.2002), *trans. denied.* It includes any act that tends to deter the court from the performance of its duties. *Id.* "Willful disobedience of any lawfully entered court order of which the offender had notice is indirect contempt." *Mitchell,* 785 N.E.2d at 1198.

■ On May 24, 2002, the court issued an order for the parties to contact Dr. Thomas Hustak to schedule appointments to perform psychological and emotional testing of the parties and C.L. within ten days. At that hearing, the trial court instructed the parties:

> Now I expect both parties to comply with this . . . when I say I want to get it done. I want to get it done. That doesn't mean scheduling the stuff or not being available for interviews for the next five years. I want it done promptly. And so I anticipate getting those interviews done during the month of June so that we can be back here in either mid-July and talk about them and see where we're at. I don't want this drug on.

Tr. p. 738.

On September 9, 2002, the trial court and the parties' counsel received a fax from Dr. Hustak indicating that there had been difficulties in completing the evaluations. At their first appointment with Dr. Hustak, Monica expressed her sentiment that she was there under protest, that he was not an independent witness for the court, and that she was currently undergoing another evaluation. Dr. Hustak indicated that he could not ethically continue unless all parties understood their legal obligations as deemed by the trial court in carrying out the orders assigned. The

trial court conducted a status conference during which the concerns of Dr. Hustak were addressed. The following day, the trial court issued an order setting forth that Dr. Hustak had been chosen by the trial court as an independent expert, that no other concurrent evaluations were to be performed by any other psychologist, and that the parties were to appear in Dr. Hustak's office on September 18, 2002, to complete the evaluations.

On September 18, 2002, the trial court received a fax from Dr. Hustak indicating that Monica was refusing to sign the informed consent necessary to proceed with the evaluation process as ordered by the trial court. On October 24, 2002, the trial court conducted a hearing with regard to Monica's refusal to sign the consent form. At the conclusion of the hearing, the trial court stated:

> I expect her to sign off on that. I want that signed. I want this thing done ... she does have a right to confrontation with him on that and I totally agree ...
>
> * * * * *
>
> I don't want this to be a situation where we go over there again and we have this form blowup, or things get started and come to an end. I want this thing to go forward.

Tr. pp. 816–817. The trial court further stated to Monica directly, after her counsel indicated that she would not sign the forms unless ordered by the trial court to do so, "Then I'm ordering you to sign the forms Mrs. Lasater ... I'm ordering you to complete this evaluation and if that requires you to sign the forms, I'm requiring you to sign the forms and go forward with the evaluation." Tr. pp. 819–20.

On November 25, 2002, the parties appeared in Dr. Hustak's office to proceed with the court ordered evaluations. When Monica was asked to sign the consent form, she signed it and then wrote that she was doing so "under duress and as per the court order of October 24, 2002." Exhibits Vol. I, Ex. 2. Thereafter, Monica filed a complaint with the Ohio State Board of Psychology against Dr. Hustak, which caused him to disqualify himself from the evaluation process. The evaluations were never completed.

The trial court found these "actions of Ms. Lasater were contemptuous of the order to cooperate with Dr. Hustak in trying to get the custody evaluation done." Tr. p. 993. The trial court also found Monica to be in contempt of the spirit of the order. Monica argues that she cannot be in contempt, which is the willful disobedience of a court order, of the spirit of the order. Specifically, she argues, "It held Monica Lasater in contempt for some vague determination that, although she had obeyed the letter of the order, she had violated its 'spirit.' Such a finding is too vague to meet the due process requirements for a holding of contempt." Appellant's Br. p. 10.

Monica was ordered by the trial court to cooperate with the process of getting psychological evaluations done promptly by Dr. Hustak. Clearly, she did not do so. The trial court was forced to conduct a status conference and a hearing to address the fact that she did not sign the consent forms so that the evaluations could proceed. The fact that she ultimately did sign the form is rather meaningless given that she did so "under duress" and clearly not with a cooperative attitude about the process. The complaint to the Ohio Board also thwarted efforts to complete the evaluations and indeed derailed them altogether. The trial court was well within its discretion to find that Monica had failed to cooperate with the evaluation process.

██ To the extent Monica excuses her failure to cooperate with the fact that

she did not find Dr. Hustak to be neutral, her attempt is misguided. Contempt proceedings are not actions designed to correct errors previously made by trial courts. *Martin v. Martin,* 771 N.E.2d 650, 653 (Ind.Ct.App.2002). Collateral attack of a previous order is allowed in a contempt proceeding only if the trial court lacked subject matter or personal jurisdiction to enter the order. *Id.* There is no such claim in this case. Even an erroneous order must be obeyed unless and until reversed on appeal. *Id.* A party's remedy for an erroneous order is appeal; disobedience of the order is contempt. *Id.* Therefore, any attempt by Monica to excuse her failure to cooperate with the trial court's orders because she did not agree with them fails. She was required to comply with the orders and to challenge the merits of the orders through the proper channels.

Discovery issues were the basis for the other contempt citation. The trial court found that Monica had refused to answer interrogatories and requests for production prepared by William despite being ordered to do so by the trial court.

The evidence during the hearing established that William served his first set of interrogatories and request for production on Monica on October 15, 2002, the answers to which were due by November 15, 2002. On December 3, 2002, Monica filed a motion for enlargement of time to answer the interrogatories and furnish the documents requested. The next day, the trial court granted Monica's request for additional time and ordered the answers to be completed by December 18, 2002. On December 17, 2002, Monica filed an objection to the interrogatories and request for production and requested a protective order.

On December 23, 2002, the trial court conducted a telephonic status conference on the matter of the discovery objections. At the conclusion of the conference, the trial court ordered the interrogatories and request for production to be completed and served upon counsel no later than December 31, 2002. The interrogatories were never returned to William.

There is sufficient evidence to support the trial court's finding that Monica willfully disobeyed a court order by not completing the discovery. Although Monica points to conflicting evidence presented during the hearing, namely her own testimony, it is within the trial court's purview to assess the credibility of the witnesses, and we will not reweigh the evidence. *See Mitchell,* 785 N.E.2d at 1198.

## II. Due Process

The next issue raised by Monica is whether her "due process rights were violated by a persistent pattern of interference with her ability to present her case." Appellant's Br. p. 10. In support of her contention that she was deprived of due process, she presents fifteen pages of examples from the proceedings. These examples range from pre-trial matters relating to venue and alleged bias on the part of the judges to evidentiary issues arising during trial regarding the admission of testimony and evidence.

After reviewing her argument, we conclude that many of the examples she points to do not amount to claims reviewable on appeal. For several of them, Monica cites no authority for her proposition that some kind of error occurred, and in many cases does not point to a specific ruling for us to review. Indiana Appellate Rule 46(A)(8)(a) states that the argument section of an appellant's brief "must contain the contentions of the appellant on the issues presented, supported by cogent reasoning. Each contention must be supported by citations to the authorities, stat-

utes, and the Appendix or parts of the Record on Appeal relied on. . . ." It is well settled that we will not consider an appellant's assertion on appeal when he or she has not presented cogent argument supported by authority and references to the record as required by the rules. *Thacker v. Wentzel,* 797 N.E.2d 342, 345 (Ind.Ct. App.2003). We will not become an advocate for a party, and we will not address arguments that are either inappropriate, too poorly developed, or improperly expressed to be understood. *Id.* Therefore, we will address only those portions of Monica's due process argument that present specific issues sufficiently developed for us to review.

### A. Judge Sims

The first portion of Monica's argument that cites authority and is specific enough to address relates to the recusal of Judge Sims.[3] Judge Pratt recused himself as Special Judge in this matter on September 18, 2000. On September 26, 2000, the regular judge assumed jurisdiction pursuant to Indiana Trial Rule 79(I) for purposes of facilitating the selection of another special judge. Thereafter, Judge Sims accepted jurisdiction as special judge over the matter. On January 18, 2001, Monica filed a motion to recuse Judge Sims, which was denied on March 1, 2001.

On August 8, 2001, Judge Sims conducted an evidentiary hearing with the parties. On August 23, 2001, Judge Sims issued an order appointing a guardian ad litem on his own motion, appointing an attorney for Monica, recusing himself, and referring the matter to the Indiana Supreme Court for the appointment of a new special judge.

▮ Monica argues that the "additional orders" were improper because Judge Sims had no jurisdiction to rule on anything but emergency matters once the change of judge motion was filed. Appellant's Br. p. 12. She argues that the guardian ad litem appointment was not an emergency. In support of her position, she relies on *City of Fort Wayne v. State ex rel. Hoagland,* 168 Ind.App. 262, 342 N.E.2d 865 (1976). Her reliance on this case is misplaced. The issue in that case concerned a motion for automatic change of venue. The situation before us does not concern a motion for change of venue. Indeed, Monica's motion to disqualify the judge filed on January 18, 2001, requested Judge Sims to recuse himself and asserted that the supreme court was the proper body to assign a new judge. Thus, the case she relies upon is inapposite to the facts before us. Regardless, Monica's motion was denied by Judge Sims on March 1, 2001. He retained jurisdiction until such time as he recused himself sua sponte, which was on August 23, 2001. He had jurisdiction to appoint the guardian ad litem and the attorney for Monica.[4]

▮ With respect to any activity on the part of Judge Sims after his recusal, we see no merit to Monica's challenge. She alleges that Judge Sims "checked out the Lasater file from the file room, preventing Ms. Lasater access to her file," as late as April of 2002. Appellant's Br. 12. However, the only action on the part of Judge Sims after his recusal that Monica specifically cites to is his order setting a hearing

---

3. Monica also comments that Judge Sims was improperly appointed and that he had no jurisdiction. However, she does not develop cogent arguments with respect to those issues with proper citations to authority. As such, we will focus our attention on the question of his actions after his recusal.

4. To the extent Monica challenges the merits of those appointments, she fails to develop a cogent argument.

for October 17, 2002. The order was reissued the following day with the signature of Special Judge Schurger, who was appointed by the supreme court after Judge Sims' recusal. Monica does not allege any prejudice from the fact that the order was reissued the following day by the appropriate judge. She only alleges:

> Judge Schurger, in an obvious attempt to cover up Judge Sim's [sic] involvement, re-issued the exact same order on October 18, 2002 under his own signature. There can be no justification for Judge Sim's [sic] involvement in this matter after August 8, 2001 ... Yet, more than two years after recusing himself, Judge Sims had the case file signed out to his office and was still issuing orders. It is impossible to document the extent of Judge Sims interference, but it is clear from the record that he was more than casually involved. Judge Sims's behavior clearly supports the decision to move this case from Allen County, but it also suggests that Adams County was not far enough removed.

Appellant's Br. p. 13 (internal citations omitted).

It is not clear from the record before us why Judge Sims issued the order setting the hearing after he recused himself.[5] However, any error in doing so was promptly corrected by the proper special judge. There is nothing in the record to suggest that Judge Sims' order was anything but a ministerial error that was corrected in due course. We see no violation of Monica's due process rights as a result of the order setting the hearing, nor does Monica specifically allege any.

### B. Dr. Ross [6]

 William called Dr. Steve Ross as a witness to testify about the psychological evaluation he performed on William. During his direct examination, the following colloquy took place:

> A: Now, the CAPI, the Child Abuse Potential Inventory, is a 160–question inventory that is often used, I often use it in cases where there is a question concerning abuse. I'll use it in CPS cases that I evaluate, or child custody cases. It doesn't confirm or disconfirm whether abuse has occurred or whether a person, you know, truly is an abuser

---

**5.** William explains the action as follows:

> Likewise, [Monica] complains that Judge Sims executed an order October 17, 2002, scheduling a hearing on [Monica's] Motion for Order to Execute Release Form. On close examination, the order had scheduled a hearing on a request having been made by Monica Lasater requiring William to execute an authorization for release of information. The parties agreed that pleadings could be filed either in Allen County or in Adams County. The Notice of Hearing form is one that would have been prepared by Monica Lasater's attorney and filed accordingly. It was doubtlessly sent to both courts for action. It is a ministerial act and no one was or could have been prejudiced, particularly not Monica since she was the one seeking the court's order.

Appellee's Br. p. 28 (internal citations omitted). We need not resolve the mystery of the order issued by Judge Sims because the order was properly issued by Special Judge Schurger.

**6.** We note that Monica cites the trial court's refusal to allow two of her witnesses to testify while at the same time permitting William's witnesses to testify over objection as an example of how her due process rights were violated. Although she relates information about pre-trial issues with respect to these witnesses, namely issues regarding authorizations and witness lists, she fails to present any legal analysis and authority for her position that the trial court's rulings concerning these witnesses were erroneous. Her blanket assertion that the trial court treated her witnesses differently than William's is insufficient to preserve the issue for appeal. *See Thacker,* 797 N.E.2d at 345.

or not an abuser, but it helps me to compare their scores with those of bona fide, adjudicated abusers.

Q: And ... so does that particular instrument measure the person that you are testing as against those who have already been determined to in fact be abusers of children?

A: That's correct, adjudicated abusers.

Mrs. Lasater: I object your honor.

COURT: MA'AM?

Mrs. Lasater: There's no profile of an abuser.

COURT: RESPONSE?

Q: Well, I mean he's the expert.

COURT: I WOULD THINK. ANYTHING ELSE MA'AM? (pause) OVERRULED. YOU MAY CONTINUE SIR.

Q: What was the finding as it relates to the Child Abuse Potential Inventory exam?

A: Your honor, again in the CAPI, it has validity indicators, and they were not elevated. There was no attempt on Mr. Lasater's part to place himself in an overly negative light or in an overly positive light. So, based upon that, I felt I had a valid protocol. And there are scores that are computed from the CAPI, and he did not lie within the abusive range. The factor scores, such as rigidity, depression, low self-esteem, they were all within acceptable, they were in low normal limits. So I didn't see problems in that area.

Q: So would you agree that he does not appear to possess traits that are found in those who are abusive to children?

A: In a normative group, the group that was standardized in this test, he did not compare similar to them.

Mrs. Lasater: Again, your honor, I object on the grounds that there is no profile of an abuser.

COURT: YOU'RE TESTIFYING. I GUESS I DON'T KNOW THAT. WHAT ARE YOU SAYING MA'AM?

Mrs. Lasater: There is no such thing as a profile of an abuser and he's comparing it to there being a profile of an abuser.

COURT: I HEARD WHAT HE TESTIFIED TO IN TERMS OF THE TEST AND THAT'S NOT WHAT YOU'RE SAYING, THEREFORE YOUR OBJECTION IS OVERRULED.

Tr. pp. 1298–99.[7]

Monica argues that Dr. Ross' testimony was presented in violation of Indiana law

7. Monica notes that Dr. Ross testified at a preliminary hearing on February 24, 1999. During the hearing, William's counsel asked Dr. Ross if there was anything in the psychological tests that would lead him to "believe that Mr. Lasater has the psychological attributes, the potential for child abuse?" Tr. p. 80. Monica's attorney objected, and the trial court sustained the objection after William's counsel agreed that there is no "allowable legal profile able to be used either for or against whether or not somebody is a child molester. That is not admissible evidence in this state either criminally or civilly." Tr. p. 80. An evidentiary ruling made in a preliminary hearing is not controlling as to the admission of the evidence in a trial. The trial court was free to consider the admissibility of Dr. Ross' testimony anew during the context of the trial and was not bound by the previous ruling. Monica also posits that William's counsel was unethical by virtue of the fact that he reintroduced the evidence during trial when she was unrepresented by counsel. From the face of the record, we see no basis for concern. It is hardly unusual for parties to attempt to reintroduce evidence previously excluded during pre-trial proceedings. Such practice is routine for evidence excluded by virtue of motions in limine, for example, and

and the case of *Buzzard v. State*, 669 N.E.2d 996 (Ind.Ct.App.1996), in particular. In that case, a psychologist was called to testify and presented profile type testimony regarding molested children and pedophiles. The testimony consisted of pedophilia profile testimony dealing with scientific models rather than examination of the parties involved, which had not been conducted. The prosecutor then argued that the defendant fit squarely within the profile definition of a pedophile. In concluding that the evidence was improperly admitted, we noted that the psychologist's testimony had little relevance to whether the defendant committed the acts for which he was charged. *Id.* at 1000.

■ The facts of *Buzzard* are distinguishable from those before us today and, therefore, we find that the *Buzzard* holding is not the proper conclusion for us to reach in this case. Here, Dr. Ross personally evaluated William and administered several psychological tests. He then advised the court of his specific findings regarding these inventories. Dr. Ross explained that the Child Abuse Potential Inventory is frequently used in these types of cases and that it compares William's score with those of known child abusers. This testimony, while in the vein of profile testimony, is not of the same type that was found inadmissible in *Buzzard*, where the evidence consisted of general pedophilia profile testimony without any relation to the defendant. Dr. Ross' testimony was specific to William's score as it related to those scores of known abusers, not just a general profile. Furthermore, Dr. Ross qualified his testimony more than once by reminding the trial court that the results do not confirm or disprove conclusively whether abuse occurred. We do not agree with Monica that Dr. Ross' testimony violated the *Buzzard* holding.[8]

■ Monica also challenges the portion of Dr. Ross' testimony relating to his description of a "hypervigilent" person. Tr. p. 1302. She argues that it constituted "egregious character testimony" about her. Appellant's. Br. p. 20. During his direct examination, Dr. Ross testified as follows:

A: Let me describe a hypervigilant person, if I can your honor—if that might be easier. A person who I would consider hypervigilant would

indeed required to preserve the issue for appeal.

8. The *Buzzard* court noted that expert testimony should be presented in compliance with Indiana Rule of Evidence 703, which requires a showing that the expert is basing his opinion on evidence "reasonably relied upon by experts in the field." *Buzzard*, 669 N.E.2d at 999 (quoting Evid. R. 703). Monica states that, "Indiana has consistently held that evidence of a profile of a child abuser does not meet that standard and is, therefore, not admissible. *See, Steward v. State*, 652 N.E.2d 490 (Ind.1995)." Appellant's Br. p. 20. We find her broad statement and, in particular, her reliance on the *Steward* case to be inaccurate. First, the *Steward* case concerned the admissibility of evidence of child abuse syndrome and profile evidence on the part of the victims, not evidence relating to profiles of the abusers. Second, the *Steward* holding provided, "The admissibility of child sexual abuse syndrome evidence will be primarily determined in the courts of this state in accordance with the provisions in the Indiana Rules of Evidence defining 'relevant evidence,' Evid.R. 401; declaring its general admissibility, Evid.R. 402; permitting exclusion due to the danger of unfair prejudice, Evid.R. 403; prohibiting opinions concerning witness truthfulness, Evid.R. 704(b); and, most particularly, prescribing the requirements for expert scientific testimony, Evid.R. 702." *Steward*, 652 N.E.2d at 498. Although the decision contains a lengthy analysis of Evidence Rule 702, the court does not mention Evidence Rule 703. Monica's assertion that the case stands for the proposition that evidence of a profile of a child abuser does not meet the Rule 703 standard is misleading.

be someone who is consistently on guard, someone who is looking both within themselves and in their personal environment for harm to come their way, somebody who might even inject or misperceive harm where harm was not really there. Hypervigilant people, your honor, who may fall within global category of paranoid people, tend to perceive events different in a way tha[n] conventional individuals would. Slight comments made to them—they might exaggerate them and feel that they were against them. They may personalize comments made to them that really were not directed to them. The hallmark thing about a hypervigilant paranoid person, your honor, is that they have a difficult time being receptive to data that does not confirm their hypothesis, confirms their beliefs. So they don't look at data that disconfirms the way they view the world, which makes them even more hypervigilant.

Q: Dr. Ross, I'm going to ask your opinion. Hypothetically, what effect, if any on a child would, well, strike that. Do you have an opinion as to what the effect on a child would be if the hypervigilant person was the custodial parent and the person about which he or she was concerned was the father of the child? What effect, if any, could that have—long term—on the father of the child? What effect, if any, could that have—long term—on the well being of the child?

Mrs. Lasater: I object, your honor, on the grounds an opinion of someone that he has not evaluated he's not qualified to state such an opinion if he has not done an evaluation on some-

one. That would include the child or the custodial parent.

COURT: HE'S NOT BEING ASKED TO EVALUATE A PERSON AT THIS POINT. HE'S BEING ASKED TO GIVE AN EXPERT OPINION ON A HYPOTHETICAL. DO YOU HAVE A RESPONSE?

Q: Well, I mean my response would be that I'm not asking him a specific. This is a hypothetical, in general terms, that I've advanced to him. When I say general terms, I've asked him to assume that we have a hypervigilant, paranoid, custodial mother who believes that the reason for her hypervigilance is as it relates to her child and her hypervigilance is based upon a belief of molestation by the father. What effect, if any, would that have on the child, long term?

COURT: MA'AM, DO YOU HAVE ANYTHING ELSE?

Mrs. Lasater: Again, I object on the application of an opinion here without the parties being evaluated, a psychologist who has not evaluated someone cannot form an opinion.

COURT: I THINK HE CAN GIVE THE OPINION ON THE THEORETICAL STATE. THE NEXT ISSUE THAT YOU RAISE, HE'S NOT BEEN ASKED THAT QUESTION. OVERRULED. YOU MAY ANSWER, SIR.

Tr. pp. 1302–03.

Monica claims, "Despite the clear indication in *Buzzard* that the value of this kind of evidence is 'substantially outweighed by the danger of unfair prejudice' and 'confusion of the issues,' Dr. Ross was permitted to continue." Appellant's Br. p. 21 (citing *Buzzard*, 669 N.E.2d at 999). Monica's reliance upon *Buzzard* here is also misplaced. Dr. Ross' testimony consisted of

the definition of hypervigilance and a hypothetical concerning the potential effect on a child. The trial court recognized that the testimony was merely a hypothetical. The testimony did not consist of profile testimony as contemplated by *Buzzard,* and Dr. Ross made no attempt to compare the hypothetical to the facts of this case.

■ Although Monica's citation to *Buzzard* is the extent of her analysis, we note that an expert witness may express his opinion regarding a hypothetical question if the following foundational prerequisites are satisfied: (1) the expert's ability to give such an opinion must be established through testimony showing he has the requisite knowledge, skill, education, or experience on which to base the opinion; and (2) there must be a proper evidentiary foundation supporting the facts that are included in the hypothetical question. *Johnson v. State,* 699 N.E.2d 746, 750 (Ind. Ct.App.1998). Here, Monica does not challenge Dr. Ross' credentials or ability to offer an expert opinion, and adequate facts were brought forth during the course of the trial to support the hypothetical question. We find no error in the trial court's admission of this testimony.

### C. Laura McFadden

Monica next challenges the trial court's rulings regarding the testimony of Laura McFadden, who was C.L.'s counselor. Monica claims, "The judge refused any evidence from Ms. McFadden as a violation of '702' because her testimony was not based on scientific principals [sic]." Appellant's Br. pp. 21–22. This is a misrepresentation of the record. Although McFadden's testimony was limited by numerous objections from William's counsel, McFadden did testify to her relationship with C.L., the length of time she had been in therapy, the types of sessions they had together, the emotional states that McFad-den had observed from C.L., and other information. Thus, the trial court clearly did not refuse "any evidence" from McFadden.

■ William's counsel objected to many of the questions Monica posed to McFadden, most frequently on the basis of hearsay and Evidence Rule 702. Monica only challenges the trial court's rulings on the basis of Rule 702, though she does not identify any particular ruling or rulings she is challenging. Evidence Rule 702 provides:

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

The trial court sustained most, if not all, of William's Rule 702 objections.

On appeal, Monica argues that the "trial judge used an improper 702 standard" because it was not the proper analysis; she argues that the testimony should have been allowed as a "matter of observations of persons with specialized knowledge" pursuant to the holding in *Malinski v. State,* 794 N.E.2d 1071, 1084 (Ind.2003). Appellant's Br. p. 22. She offers no analysis or further development of her argument.

Monica sought to have McFadden testify as an expert witness and to offer opinions and conclusions in that capacity. The primary bone of contention William had with McFadden's testimony was that she had not been properly qualified as an expert. McFadden's supervisor, Dr. Greggory

Sowles, testified before McFadden and stated that McFadden is in the process of completing her licensing requirements for the State of Indiana, but that she is not yet a licensed therapist. It was reasonable for the trial court to conclude that although McFadden did have some experience in counseling and related education, she did not qualify as an expert in therapy given that she had not yet completed the licensing requirements.

The *Malinski* case does not change this conclusion. In that case, our supreme court found admissible the testimony of a forensic pathologist that, in his opinion, a woman featured in several gruesome and explicit photographs was not a willing participant in them based on the position of her body and injuries she sustained. *Id.* at 1085. The supreme court concluded that it was expert testimony based on his specialized knowledge rather than on reliable scientific principles. *Id.* However, the pathologist's qualifications as an expert were not at issue in that case, and the supreme court specifically stated that it was "expert" testimony. *Id.* Here, we do not even reach the question of whether the substance of McFadden's testimony should have been admitted as expert testimony, either under the reliable scientific principles test or the specialized knowledge test, because Monica never properly qualified her as an expert. There is no error here.

### D. Counseling Report

■ The final due process violation Monica claims and supports with authority relates to the admission of a counseling report. During William's case-in-chief, he called Shelly Clodfelter to testify. Clodfelter is the school counselor at C.L.'s school.

During her testimony, William asked her if she was familiar with records that are kept at the school, in particular a conference record, and asked her if she recognized the exhibit marked Petitioner's Exhibit 25. She indicated that she was familiar with the record. William then asked her if it would be a record normally kept in the regular course of business, to which she replied that it would be. Thereafter, William moved to admit the exhibit, which was C.L.'s record. Monica objected on the basis that "Ms. Clodfelter has had nothing to do with that. The teacher who has is not here to testify to that and explain that." Tr. p. 1639. The trial court told Monica, "The testimony was this is a regular business record. Any other objection Ma'am?" Tr. p. 1639. Monica responded, "Again, I believe the person who reported that is not here to testify to it...." Tr. p. 1639. The trial court overruled the objection and admitted the record as a regular business exception.

Evidence Rule 803(6) [9] establishes an exception to the general rule that hearsay evidence is inadmissible and provides:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony or affidavit of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

---

9. We note that in her brief, Monica cites 803(b) as the business record exception. Given that there is no 803(b) and that the exception is actually contained in 803(6), we will assume that the error is merely a typographical one.

Monica now claims on appeal that William did not establish an adequate foundation to admit the report.

Monica's objection to the report during trial was that the teacher was not there to testify, which is not the same as her foundation argument on appeal. It is well settled that a party may not object on one ground at trial and rely on a different ground on appeal. *West v. State*, 755 N.E.2d 173, 187 n. 3 (Ind.2001). Furthermore, because the report was admitted under the business record exception to the hearsay rule, the teacher was not required to testify herself for the document to be admissible. *See* Evid. R. 803(6). The trial court prompted Monica to change her objection by reminding her that William was offering the report under the business records exception. Monica did not change her objection and again claimed that the teacher needed to testify herself. At no point did she challenge the foundation William laid for the admission of the report pursuant to Evidence Rule 803(6), and she will not be permitted to do so for the first time on appeal. *See West,* 755 N.E.2d at 187 n. 3.

In conclusion, none of the instances cited by Monica in her brief amount to errors or they have been waived on appeal. As a result, we conclude that they do not amount to a violation of her due process rights individually or cumulatively. We see no persistent pattern of interference with her ability to present her case. What we do notice after reviewing the transcript of the lengthy trial is that Monica understandably struggled repeatedly with trial procedure and with the presentation of evidence during the course of the proceedings. Indeed, in several instances she may have been successful in keeping out some of William's evidence had she made the proper objections and, likewise, would likely have been successful in getting more of her own evidence admitted had she known how to properly respond to William's objections. However, we cannot review this case differently than any other case. A litigant who chooses to proceed pro se will be held to the rules of procedure the same as would trained legal counsel. *Bedree v. DeGroote,* 799 N.E.2d 1167, 1173 (Ind.Ct.App.2003), *trans. denied.* At the time of trial, Monica had eight different attorneys representing her in this matter, some of whom had been appointed by the trial court at public expense. Although it is not for us to speculate as to why she had so many different attorneys, it is clear that she was not improperly prevented from having counsel during the trial by the trial court. Therefore, we find no due process violation.

### III. Findings of Fact

The findings relating to custody in this case span thirteen pages. Monica alleges that "[n]ot only are [the findings] not supported by the evidence, many are irrelevant or shamelessly bias." Appellant's Br. p. 24. She then specifically challenges some of the findings. We will address each finding she challenges.

When findings of fact and conclusions of law are entered by the trial court, as occurred here, we will not set aside the judgment unless it is clearly erroneous; that is, unless we are definitely and firmly convinced the trial court committed error. *Indiana Family & Social Serv. Admin. v. Amhealth (Evansville), Inc.,* 790 N.E.2d 162, 165–66 (Ind.Ct.App.2003), *trans. denied.* The findings must disclose a valid basis for the legal result reached in the judgment, and evidence at trial must support each of the specific findings. *Id.* We defer to the trial court when such evidence conflicts. *Id.* We will neither reweigh the evidence nor reassess the credibility of the witnesses before the court. *Id.* Rather, we

will affirm if there is sufficient evidence of probative value to support the decision, viewing the evidence most favorable to the judgment and the reasonable inferences drawn therefrom. *Id.* To the extent that the judgment is based on erroneous findings, those findings are superfluous and are not fatal to the judgment if the remaining valid findings and conclusions support the judgment. *Id.*

■ Monica first challenges finding 110, which states, "Several of [Monica's] witnesses who testified at the trial of this cause exhibited substantial dislike and animosity toward [William.]" Appellant's App. Vol. 1, p. 64. She concedes that "[t]his may be true," but questions its relevance given that several of William's witnesses also expressed dislike and animosity toward Monica. Appellant's Br. p. 24. She admits this finding is supported by the evidence. We do not agree that this finding is irrelevant in the context of the trial court's other findings and conclusions. The trial court made this finding in conjunction with several others relating to why it would be detrimental to C.L. for Monica to have custody of her, namely because the environment Monica would place C.L. in is toxic and would attempt to create animosity between C.L. and William. This finding is not irrelevant.

■ Monica next challenges finding 69, which states:

At trial, Allen County Sherriff's Detectives, in response to a question by [Monica,] testified that [William] had passed two (2) polygraph examinations, that the child had made prior statements to a psychologist that no abuse had occurred, authorities in Columbus, Ohio had closed a similar case as being unsubstantiated and unfounded, and there was no evidence of a new allegation different than one made in April 1998.

Appellant's App. Vol. I, pp. 58–59. Monica argues that this finding is erroneous because Tina Taviana was the only Allen County detective to testify as described. She then claims that although Detective Taviana referenced the polygraph exam during her testimony, "[n]one of the other information" in the finding appears in the transcript. Appellant's Br. p. 25.

The fact that the trial court referenced detectives when only one detective testified about the polygraphs is harmless error at best. The fact remains that Detective Taviana did so testify. Furthermore, Detective Taviana testified regarding the other information in the finding when she read the case points from her report during cross-examination. This finding is supported by adequate evidence.

■ Monica next challenges finding 71, which states, "Less than thirty (30) days before trial, [Monica] filed a Petition for Recusal of the presiding Judge, Charles F. Pratt." Appellant's App. Vol. I, p. 59. She argues that the finding is technically accurate, but is "cherry-picked from the record in a manner to disguise the underlying truth." Appellant's Br. p. 25. She claims that the trial court failed to note that her petition for recusal was filed in response to the judge's ethical disclosure. She also challenges finding 73, which states, "[Monica] had previously moved for an automatic change of Judge from the Allen Circuit Court Magistrate Judge, shortly after the commencement of the proceedings." Appellant's App. Vol. I, p. 59. She asserts that she has a right to an automatic change of judge and that it should not have been included in the findings. In both cases, Monica does not allege the findings are unsupported by the evidence. Both findings recount procedural history, which is important for giving context to the issues arising in this case. To the extent the trial court did not men-

tion that her petition to recuse was in response to the judge's recent ethical disclosure, we find any error to be harmless. That finding did not form a basis for the custody determination or other issues decided during the trial other than explaining the history of the case and the procedural posture.

Monica next challenges finding 44, which states, "The Court notes that the child is less than fourteen (14) years of age and her desires are noted by the Court, but are not controlling in determining best interests of the child." Appellant's App. Vol. I, p. 55. Again, Monica does not allege that this finding is unsupported by the evidence. Rather, she argues that it is a "misunderstanding of the law" because none of the factors enumerated in Indiana Code Section 31–17–2–8, which contains factors to be considered in custody cases, are "controlling." We agree with Monica that none of the statutory factors are controlling. However, we see no harm in the trial court's finding that C.L.'s wishes were not controlling. Although the finding was perhaps inartfully worded to the extent that it used the word "controlling," the gist of the finding is clear. The purpose of the finding was to establish that less consideration would be given to C.L.'s desire to live with her mother because she was under fourteen years old. It is not a misunderstanding of the law.

Monica next discusses findings 120 and 121. Finding 120 states, "The evidence established that the minor child is intelligent and performing well in school." Appellant's App. Vol. I, p. 65. Finding 121 provides, "The evidence further established that the child has recently been dishonest with her teacher with regard to cheating on tests." Appellant's App. Vol. I, p. 65. She notes that finding 120 is supported by the evidence, but she argues that finding 121 is "a gratuitous attempt to

negate statements [C.L.] made relating to her father by claiming she is a liar." Appellant's Br. p. 27. We need not scour the record for evidence to support this finding because any error in it would be deemed harmless. Findings, even if erroneous, do not warrant reversal if they amount to mere surplusage and add nothing to the trial court's decision. *Bell v. Clark,* 653 N.E.2d 483, 489 (Ind.Ct.App.1995), *adopted on appeal,* 670 N.E.2d 1290 (Ind. 1996).

Monica's next challenge is to finding 138. This finding states, "The Court finds, based upon the evidence, a concern for the emotional stability of [Monica.]" Appellant's App. Vol. I, p. 67. She claims that "[n]othing in the record supports this finding." Appellant's Br. p. 27. She points to the testimony of the guardian ad litem that she had no concerns for Monica's mental health. She also argues that the only "evidence" in the record regarding Monica's mental health was the hypothetical presented by Dr. Ross regarding a hypervigilent person.

Contrary to her claim, our review of the record reveals ample evidence supporting the finding. The finding does not state that the trial court found mental illness or some other form of mental defect requiring expert opinion precisely on point. The trial court's concern for her emotional stability could have been, and no doubt was, based on numerous pieces of evidence from several witness, including Monica's behavior out of court, her demeanor and statements in court, her statements to others, and her failure to cooperate with trial court orders. There is evidence to support this finding. Consideration of the contradictory evidence Monica directs us to would require us to reweigh the evidence, which we will not do.

Monica's next argument is that findings 137 and 139 are attempts to "bootstrap the improper finding in 138 to reach a similar conclusion." Appellant's Br. p. 28. Finding 137 states, "The Court finds based upon the evidence that should the child remain in the custody of [Monica], it would seriously disrupt her relationship with her father and long term, potentially men in general." Appellant's App. Vol. I, p. 67. Finding 139 states:

> The Court finds that should the child remain in the custody of [Monica], that based upon the evidence and expert testimony, it is indicated that the child will become defiant to authority, present oppositional behavior to parents and teachers, develop misrepresentations and deceit as coping strategies and develop a pattern of adaptation all to the emotional detriment of the child.

Appellant's App. Vol. I, p. 67. She argues that the findings are based on improper character testimony offered by Dr. Ross and Dr. Epslin.

We have already concluded that Dr. Ross did not provide improper character evidence. We recognize that the hypothetical testified to by Dr. Ross was never linked to Monica through his testimony and, thus, that it may have been improper for the trial court to adopt the language used in the hypothetical. However, even if these findings are erroneous, the judgment is still supported by the other findings. *See Lakes & Rivers Transfer v. Rudolph Robinson Steel Co.*, 795 N.E.2d 1126, 1132 (Ind.Ct.App.2003) (noting that to the extent that the judgment is based on erroneous findings, those findings are superfluous and are not fatal to the judgment if the remaining valid findings and conclusions support the judgment). Numerous other findings substantiate the conclusion that Monica's custody of C.L. would not be in

C.L.'s best interest. For purposes of illustration, we point to these findings:

111. At visitation exchanges, [Monica] requires that the minor child be escorted from her vehicle to [William's] vehicle by one (1) or more of her friends. The Court finds that the effect of doing so is to instill in the child a perceived reason to fear [William], her father.

* * * * *

115. The Court finds based upon the testimony and the evidence presented, that the majority of those persons with whom [Monica] and by necessity the child, associate with in their home community have disdain for the rule of law similar to that of [Monica]. They also express a hostile attitude toward [William] in the presence of the minor child. The friends and family members of [Monica] present a toxic community environment to which the child is exposed relative to her father. The Court finds the home community of [Monica] to be unhealthy and inappropriate for the minor child.

* * * * *

116. Several of those persons who testified on behalf of [Monica] were evasive with their answers, specifically as it relates to the necessity to follow the rule of law and Orders of the Court.

117. The Court finds that to be exposed to such influences over time, not to be in the child's best interest.

* * * * *

127. The Court further finds that [Monica] has refused to accept these facts and continues to attempt to alienate any relationship between [William] and his child. [Monica] refuses to act in any fashion with a view towards improving

the relationship between [William] and child.

\* \* \* \* \*

130. The Court finds that [Monica] has engaged in an attempt to convey to the child of the parties that [William] cannot be trusted.

131. The Court finds that [Monica] has intentionally obstructed and interfered with [William's] ability to maintain and develop a healthy relationship with his child.

132. The Court specifically finds that [Monica] has made false allegations to law enforcement officials in an effort to deny [William] visitation with the minor child.

\* \* \* \* \*

134. The Court finds that [Monica] has created a sentiment in the community that surrounds the child that the Courts are to be distrusted, further that Court Orders need not be followed, unless they conform to [Monica's] wishes.

135. The Court finds that [Monica] does not present as an appropriate parental example to the minor child due to her repeated refusal to follow Orders of the Court and by her attempts to manipulate the judicial process.

136. The Court finds that to continue to expose the child of the parties to the attitudes that prevail in [Monica's] home and to those community of persons with whom she associates will likely cause the child long term emotional harm.

\* \* \* \* \*

140. The Court finds that the conduct of [Monica] toward [William] is designed to instill in the child a fear of [William].

141. The Court finds that the emotional environment surrounding the child while in [Monica's] custody places the child's emotional well-being at risk.

\* \* \* \* \*

143. [Monica's] continued behavior and expressed animosity toward [William] places the child's welfare at stake.

144. The Court finds that the child's continued exposure by [Monica] to the community of people with whom she surrounds the child, those of whom express the same beliefs as [Monica], present a toxic environment that places the child's emotional welfare at stake.

Appellant's App. Vol. I, pp. 64–68. There are other similar findings. Therefore, we are comfortable that there were ample findings to support the judgment, even if findings 137 and 139 are erroneous.

In sum, Monica's challenge to the findings fails. The findings are supported by the evidence, and any errors contained in them are harmless.

### IV. Visitation

Monica finally challenges the trial court's order with respect to visitation. Upon review of a trial court's determination of a visitation issue, we reverse only when the trial court manifestly abuses its discretion. *Reno v. Haler*, 734 N.E.2d 1095, 1101 (Ind.Ct.App.2000), *trans. denied*. No abuse of discretion occurs if there is a rational basis in the record supporting the trial court's determination. *Id.* We will neither reweigh evidence nor judge the credibility of witnesses. *Id.* In all visitation controversies, courts are required to give foremost consideration to the best interests of the child. *Pennington v. Pennington*, 596 N.E.2d 305, 306 (Ind.Ct.App.1992), *trans. denied*.

Indiana has long recognized that the rights of parents to visit their children is a precious privilege that should be enjoyed by noncustodial parents. *Hanson v.*

*Spolnik,* 685 N.E.2d 71, 79 (Ind.Ct.App. 1997), *trans. denied.* As a result, a noncustodial parent is generally entitled to reasonable visitation rights. Ind.Code § 31–17–4–1. However, the right of visitation is subordinated to the best interests of the child. *Hanson,* 685 N.E.2d at 79. Indiana Code Section 31–17–4–1 defines the visitation rights of a noncustodial parent and provides:

> A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation by the noncustodial parent might endanger the child's physical health or significantly impair the child's emotional development.

▇▇▇▇ Here, the trial court ordered that Monica was to have no visitation or contact with C.L. for a period of ninety days after the date of the physical exchange of custody to William. The trial court ordered that at the conclusion of the ninety days, Monica is to have supervised visitation on alternating Saturdays for two hours until a psychologist (chosen from a panel offered by the trial court) reports that Monica has made sufficient progress so that she no longer presents a danger to the emotional health of C.L. Monica argues that the limited visitation the trial court ordered is not supported by the trial court's findings because she contends the trial court did not make a finding that reasonable visitation would be harmful. She further argues that the evidence does not support a finding that visitation would be harmful to C.L.[10]

In *Hanson,* 685 N.E.2d at 71, the mother challenged the trial court's visitation order, which denied her visitation for the first sixty days and then only permitted supervised visitation for two hours every other week for the next three months, on the basis that it effectively terminated her parental rights. She also argued that there was no evidence presented to support such restricted visitation and that other restrictions imposed by the court, including supervised visitation and its order prohibiting either party from discussing any matters pertaining to the custody proceedings with the child, adequately protected the child's best interests.

On appeal, we found that the trial court restricted the mother's visitation because her behavior and animosity towards the father and her failure to provide adequate counseling placed the child's welfare at stake. *Id.* at 79. We found that the evidence presented at trial sufficiently supported this determination. *Id.* We noted a professional testified that highly structured, supervised visitation was necessary due to the mother's behavior and the possibility that she would attempt to undermine the child's relationship with the father. *Id.* We also noted that the guardian ad litem specifically recommended that the court severely limit any visitation by the noncustodial parent due to the parties' volatile relationship and its effects on the child. *Id.* Finally, although concerned by the restrictive nature of the initial custody order, we noted that the trial court had recently extended the mother's visitation to six hours every other week and had allowed for periodic reevaluation of the visitation schedule. *Id.* Given the animosity between the parties and the trial court's movement towards more liberal visitation, we concluded that we could not find the

---

10. In her reply brief, she states that the trial court's order requiring her to see a psychologist before she can have regular visitation with C.L. is a manifest abuse of discretion. This issue was not raised in her Appellant's Brief and is, therefore, waived. Issues cannot be raised for the first time in a reply brief. Ind. Appellate Rule 46(A)(8); App. R. 46(C); *Felsher v. University of Evansville,* 755 N.E.2d 589, 601 n. 6 (Ind.2001).

trial court's visitation order constituted a manifest abuse of discretion. *Id.* Therefore, we found no error. *Id.*

We find the *Hanson* case instructive to the issue before us in this case. In both cases, the trial court found that the mothers' behavior and animosity toward the fathers put the children's well-being at stake. We recognize that in the *Hanson* case the trial court was presented with direct testimony concerning the risks of more visitation with the mother, whereas in this case the trial court was presented with a more limited amount of evidence relating specifically to visitation. However, the trial court here was presented with substantial evidence relating to Monica's animosity and emotional wellbeing. It was appropriate for the trial court to consider that evidence in crafting the visitation arrangement with Monica.

To the extent Monica challenges the trial court's order on the basis that there were insufficient findings to support the restricted visitation because the findings related to the custody determination, we are not persuaded by her argument. The trial court included an abundance of findings relating to the acrimonious relationship between the parties, the erratic behavior of Monica, the history of not cooperating with or following court orders, and the risk of emotional harm Monica poses to C.L. The trial court was not required to specify which findings supported which conclusions and may draw a conclusion from a combination of findings that may also support other conclusions. In other words, one set of findings may support, and usually does support, many conclusions. We conclude that the trial court's decision to restrict Monica's visitation was supported by the findings and evidence concerning C.L.'s emotional well-being. In addition, as in *Hanson,* the trial court here included specific provisions for expanded visitation, indeed normal unsupervised visitation, upon Monica's seeking counseling and establishing that she no longer poses a threat to C.L.'s emotional health. The trial court's order was not crafted to be a punishment to Monica, but was restricted to the extent necessary to protect C.L.'s best interest. There is no abuse of discretion.

## V. Inflammatory Brief

We would be remiss if we did not comment on the inflammatory nature of Monica's Appellant's Brief. There are several instances where Monica makes inappropriate comments in her brief and at some points makes allegations of unethical conduct by judges and attorneys. We note a few of those instances.

When referring to the trial court's rulings relating to the William's witnesses versus those relating to her own witnesses, Monica claims, "This pattern of harassment of Monica and deference to anything William does continued throughout the trial." Appellant's Br. p. 17. She further alleges that the trial judge "interfered with the presentation of [her] case" repeatedly. Appellant's Br. p. 18. Indeed, she baldly claims, "The judge articulated his bias quite clearly on several occasions." Appellant's Br. p. 18. With respect to her due process argument, she states:

It is perhaps true that each of these errors, taken individually, could be seen as harmless. However, they cannot be viewed in isolation. Something was seriously wrong with this case. It is the pattern which must be considered. It cannot be easily explained. It is not rational that a judge would be checking out a case file years after being recused or that a Clerk's office would refuse to serve the attorney of record in a case, but both happened in this case. Ms. Lasater believes it happened because her husband and his attorney have mon-

ey, power and influence in Allen County and she does not. We will never know. Perhaps all the strange happenings in this case were coincidental, but perhaps not.

Appellant's Br. pp. 23–24 (internal citation omitted).

Monica describes the trial court's findings this way: "Some findings which are technically accurate are cherry-picked from the record in a manner to disguise the underlying truth." Appellant's Br. p. 25. She further states, "Taken as a whole, the findings are not a reflection of the record in this case. They are a list of largely irrelevant information designed for one purpose, to continue the animosity which has plagued this case from the beginning." Appellant's Br. p. 25. In her conclusion, Monica states:

The decision to give custody of [C.L.] to William Lasater was not based on the evidence at trial. It was not based on the best interests of the child. In fact, the best interest factors were barely considered. William Lasater was awarded custody because the judge didn't like Monica Lasater. She annoyed him. She annoyed the whole county. From the opening statements to the closing arguments it was apparent. Her witnesses were not permitted to testify. Her evidence was excluded, while William's inadmissible evidence was allowed. She was constantly interrupted, intimidated and admonished.... The decision in this case was not based on the evidence or the relevant law. It was based on the personalities of the players.

Appellant's Br. p. 30.

Furthermore, Monica alleges at various points that William's counsel was unethical during the proceedings of this case. She claims:

Attorney Leonard attempted to elicit this testimony from William Lasater, who responded, "No sir, I didn't know anything about the complaint until you indicated to me that there was some kind of complaint." He tried again and his client replied, "I don't know. I just don't know." Attorney Leonard, unable to get the proper response, resorted to testifying himself, and responded "But you subsequently learned that he disqualified himself because of the complaint that was filed." It is on this "evidence" that the court relied.

Appellant's Br. p. 9 n. 6 (internal citations omitted). She later alleges that he had forgotten his duty to be candid with the court during trial when he did not respond to an objection by Monica to evidence that he had previously agreed was inadmissible. She claims, "His silence was a clear violation of Rule 3.3." Appellant's Br. p. 20. She further posits, "It was not unusual for Mr. Leonard to testify in this case. In fact, he was even permitted to directly answer a question put to a witness. Whenever he was unable to elicit the testimony he desired, he simply supplied it." Appellant's Br. p. 23 (internal citation omitted).

■■■ It is not Monica's challenge to the trial court's decision in and of itself with which we are concerned. "Lawyers are completely free to criticize the decisions of judges. However, as licensed professionals, they are not free to make recklessly false claims about a judge's integrity." *In re Wilkins,* 782 N.E.2d 985, 986 (Ind.2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 63, 157 L.Ed.2d 27. By alleging that the trial court's decision was based on the judge's personal feelings about Monica or the other personalities involved in the case, she impugns the judge's integrity.

Our supreme court recently addressed similar concerns in *In re Wilkins,* 777

N.E.2d 714, 717 (Ind.2002), *modified on rehearing*. In that case, the supreme court reviewed language contained in a footnote in a petition for rehearing. The offending language consisted of:

Indeed, the [Court of Appeals] Opinion is so factually and legally inaccurate that one is left to wonder whether the Court of Appeals was determined to find for Appellee Sports, Inc., and then said whatever was necessary to reach that conclusion (regardless of whether the facts or the law supported its decision).

*Id.* at 716.

In finding that the comments in the footnote were not even "colorably appropriate," the supreme court reasoned that in the footnote, the respondent suggested that the judges on the court of appeals may have been motivated in their decision making by something other than the proper administration of justice and suggested unethical motivations. *Id.* at 717. Our supreme court further explained:

[W]e find that the respondent offered no evidence to support his contentions that, for example, the Court of Appeals was determined to find for appellee, no matter what. Without evidence, such statements should not be made anywhere. With evidence, they should be made to the Judicial Qualifications Commission.

*Id.* at 717–18 (internal citations omitted).

Here, such comments do little to advance Monica's position as to why the trial court committed reversible error and, therefore, do not promote responsible advocacy on her behalf. Significant parts of her brief are permeated with sarcasm and disrespect. *See WorldCom Network Services, Inc. v. Thompson*, 698 N.E.2d 1233, 1236–37 (Ind.Ct.App.1998) ("Righteous indignation is no substitute for a well-reasoned argument. We remind counsel that

an advocate can present his cause, protect the record for subsequent review and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics."), *trans. denied.* Such a brief reflects a lack of professional responsibility on the part of counsel and does little to serve the interest of the client to whom counsel is responsible in this appeal. *See Moore v. Liggins*, 685 N.E.2d 57, 66–67 (Ind.Ct.App.1997).

■ For the use of impertinent, intemperate, scandalous, or vituperative language in briefs on appeal impugning or disparaging this court, the trial court, or opposing counsel, we have the plenary power to order a brief stricken from our files and to affirm the trial court without further ado. *Wright v. State*, 772 N.E.2d 449, 463 (Ind.Ct.App.2002). In the interest of evaluating the merits of Monica's issues on appeal, we choose not to strike the Appellant's Brief filed by Monica's counsel or any portion thereof.[11] Because we choose not to exercise our discretion to strike the brief, however, counsel should not confuse this with approval or condoning of the unprofessional, disrespectful, and at times outrageous remarks and allegations made in the body of the brief. We appreciate vigorous advocacy, but we will not countenance the sort of lawyering exhibited here. We admonish counsel to advocate more professionally in future matters before this court.

## Conclusion

The trial court did not abuse its discretion when it found Monica in contempt, and she was not deprived of her due process rights by the trial court. Furthermore, the findings are supported by the evidence. The trial court did not abuse its discretion in ordering restricted visitation

---

**11.** William's motion to strike portions of the Appellant's Brief is hereby denied.

between Monica and C.L. given the facts of this case. We affirm the trial court's order in all respects.

Affirmed.

KIRSCH, C.J., and FRIEDLANDER, J., concur.