# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 16 2017, 9:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald J. Frew
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of: <br><br> A.K.G. (Minor Child), <br><br> and <br><br> S.M.H. (Mother), <br> *Appellant-Respondent,* <br><br> v. <br><br> Indiana Department of Child Services, | March 16, 2017 <br><br> Court of Appeals Case No. 02A03-1608-JT-1869 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable Sherry A. Hartzler, Judge Pro Tempore <br><br> The Honorable Lori K. Morgan, Magistrate <br><br> Trial Court Cause No. 02D08-1507-JT-87 |

*Appellee-Petitioner.*

**Najam, Judge.**

# Statement of the Case

S.M.H. ("Mother") appeals the termination of her parental rights to A.G. ("Child") upon the petition of the Indiana Department of Child Services ("DCS"). Mother presents a single issue for review: whether the trial court committed clear error when it held that termination of Mother's parental rights was in Child's best interests.

We affirm.

# Facts and Procedural History

On November 5, 2012, DCS filed a petition alleging that Child, born on February 7, 2005, was a Child in Need of Services ("CHINS") because Mother's then-boyfriend/later-husband ("Stepfather") had struck Child in the face, leaving welts and a handprint on her cheek. The trial court adjudicated Child a CHINS and Child remained in Mother's home under DCS supervision. The State charged Stepfather with battery and obtained a no-contact order as to Stepfather and Child. Stepfather later pleaded guilty to the battery charge and received a two-year sentence, suspended to probation.

[4] The trial court ordered Mother to refrain from criminal activity, maintain appropriate housing, cooperate with service providers, maintain contact with DCS, provide child-appropriate clothing, and cooperate with all rules of DCS placement. Mother was generally compliant with services offered by DCS. However, she and Stepfather twice violated the no-contact order. Therefore, on September 30, 2013, DCS removed Child from Mother's home and placed her in foster care, and Stepfather was sent to prison to serve his previously suspended sentence. During Stepfather's incarceration, Mother divorced him and obtained independent housing. However, after Stepfather was released from prison, he and Mother reconciled. They contacted DCS to request services for Stepfather and he began individual counseling based upon a DCS referral.

[5] Child was in a series of foster home placements, one with a maternal aunt in Arizona. In December of 2014, the aunt determined that she could not handle Child's behavioral issues and Child returned to Indiana.[1] DCS again placed Child in foster care.

[6] On July 17, 2015, DCS petitioned to terminate Mother's parental rights.[2] The trial court conducted an evidentiary hearing on the termination petition.

---

[1] It appears that long-term foster care placements for Child were made more difficult by Child's tantrums and smoking. Also, Child had reportedly learned how to access pornography on home computers and had attempted to share sexual information with some of her foster siblings.

[2] DCS also petitioned to terminate the parental rights of D.C. ("Father"). Father is not an active party to this appeal.

Child's DCS Family Case Manager ("FCM"), Child's therapist, and the Guardian Ad Litem ("GAL") all testified that Child should not be around Stepfather, even though the no-contact order had expired by the time of the termination hearing. FCM Tamra Powell said DCS required that Stepfather only have visitation with Child with a licensed therapist present, but Mother failed to comply with that requirement by allowing him to violate the no-contact order twice. The FCM also said that, although Mother had maintained contact with DCS, completed recommended services, and requested referrals for additional services, Mother failed to comply with the requirement that she have stable housing with enough room for Child. The FCM testified that Mother had reported that Child had watched pornography on an iPad while Child lived with Mother and Stepfather.

[7] Child's therapist, Kristen Matheson, M.S.W., testified that Child suffered trauma due to Stepfather's battery of her and that it was not healthy for Child to be around Stepfather. She also testified that Child disclosed in therapy that Child had been sexually abused by one of Mother's friends. And the GAL testified that termination of parental rights was appropriate because Child "deserves permanency" after years in foster care and should not have visitation with Stepfather without the approval of Child's therapist. Tr. at 193.

[8] At the termination hearing, Mother, who had completed parenting classes and had been generally compliant with home-based services and psychological therapy, testified that she was living with Stepfather in a studio apartment at an extended-stay hotel that consisted of one room with one bed and a couch that

could turn into a bed. Mother also testified that she was employed at Wal-Mart as a greeter with nearly full-time hours, bringing home approximately $200 per week. Mother intended to look for a larger apartment if Child could live with her again, but Mother could not afford such an apartment without also relying on Stepfather's monthly Supplemental Security Income and Social Security Disability checks.

[9] Mother testified that she intended to continue living with Stepfather for the foreseeable future and that she would be comfortable with having Child live with her and Stepfather. When asked if she had any concerns about Child being around Stepfather, Mother testified that:

> there's always going to be in the back of my mind or is this . . . something that is a risk I'm willing to take and yes because I know in my heart and I know in my mind that that incident was one time and he hasn't done it since and he hasn't . . . never had a history of abusing a child or hitting a child just this one time.

Tr. at 67.

[10] On July 18, 2016, the trial court entered its findings of fact, conclusions, and order terminating Mother's parental rights. In relevant part, the trial court's order provides:

> Although she "successfully" completed homebased services in July of 2014, the mother still did not have stable or appropriate housing. Lack of stable and/or appropriate housing has been an issue since the underlying CHINS proceedings began and said condition has not been remedied despite the provision of services

to address the issue. During the course of those proceedings, the mother . . . resided in at least 5 different residences. There were approximately 4 other adults residing in one of those residences and the mother was evicted from one of the residences for non-payment of rent. Currently, [Mother] is residing with [Stepfather] in a studio apartment which is not an appropriate home or living environment for the child . . . .

During the course of the underlying CHINS proceedings, the mother has not had stable employment or other income with which to sustain herself and the child. At the time of the trial, she was employed by Wal-Mart as a greeter. She had previously worked in the delicatessen at Wal-Mart, however, [she] was terminated from that position and offered the position as a greeter. The mother had been employed in approximately 5 other jobs throughout the history of the proceedings, however, [she] was unable to maintain a job for any substantial period of time.

At trial, the mother argued that she is substantially compliant with the orders of the court. While that assertion may be true, the Court found in virtually every Court order after the order of April 10, 2013, that[,] despite her compliance with the orders of the court, she had not benefited from services provided. . . .

* * *

Throughout the course of the underlying proceedings, the mother demonstrated that[,] despite the provision of services, she is unable to provide a safe, suitable or stable home environment and is otherwise unable to provide for the basic necessities of a suitable home for the raising of the child. She has been unwilling or unable to remedy the reasons for removal and reasons for placement of the child outside of the home. The Court finds that the DCS has proven by clear and convincing evidence that there

is a reasonable probability that the reasons for removal of the child from the mother's home and the reasons for continued placement outside of the mother's home will not be remedied and/or that continuation of the parent/child relationship poses a threat to the well-being of the child.

* * *

At the time of the initiation of the proceedings in the underlying CHINS case, the mother's housing was inappropriate in that [Stepfather] was residing in the home with the child and he had battered her and left his hand print on her face.

* * *

During the course of the underlying CHINS proceeding, the mother failed to protect the child from [Stepfather] . . . . Despite the No Contact Order that had been entered in the criminal proceedings, on at least 2 occasions[] she permitted him to have contact with the child which resulted in his incarceration.

* * *

At trial, [Mother] testified that she is aware that the professionals who are treating [Child] are not comfortable with the child being around [Stepfather]. Despite being aware of their concerns, [Mother] testified that she is not concerned with [Stepfather] having contact with [Child] and that having him around the child is a risk that she is willing to take. There are significant concerns that the mother is unable to see the impact that the battery, exposure to pornography and potential molestation have had on the child and thus, is unable to attend to her emotional needs and, further, is unable to protect the child from further abuse and/or harm.

The mother was molested as a child and believes that the child may have been molested by her father, the maternal grandfather. Additionally, she informed the DCS at a Child and Family Team Meeting that the child may have had access to pornography in the home in which she resided with [Stepfather] from February of 2012 to October of 2013. The child has disclosed to her therapist that she was sexually abused by one of her mother's friends in a home in which she resided with the mother.

* * *

Given the mother's inability to benefit from services provided and to ensure the safety and protection of the child . . . , the Court finds that the DCS has proven by clear and convincing evidence that termination of the parent-child relationship is in the child's best interests and that the DCS has a satisfactory plan for the care and treatment of the child which is placement of the child for adoption.

Appellant's App. at 31-32, 34-35. This appeal ensued.

# Discussion and Decision

### Standard of Review

[11] Mother maintains that the trial court's order terminating her parental rights was clearly erroneous. We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Family & Children (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances

surrounding a termination. *Schultz v. Porter Cty. Ofc. of Family & Children (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[12] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services.
>
> * * *
>
> (C) [and] that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2) (2016). DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights. *Id*. DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[13] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Ofc. of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Ofc. of Family & Children (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999). *trans. denied*.

[14] Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Ofc. of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98,

102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[15] Mother contends that the trial court erred in both its findings of fact and in its conclusions thereon. As to the latter, she does not challenge the trial court's conclusions that she has failed to remedy the conditions that resulted in the child's removal or that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child. Rather, she alleges only that the trial court erred in concluding that termination is in the best interests of Child.

### Trial Court's Findings of Fact

[16] First, Mother appears to contend that the evidence did not support the trial court's following findings of fact: (1) she failed to benefit from services; (2) her home and cohabitation with Stepfather at the time of the termination hearing was not appropriate for Child; (3) and she failed to see the impact that Child's exposure to pornography had on Child. However, the first two findings are supported by the evidence, and Mother's assertions to the contrary are simply requests that we reweigh the evidence, which we will not do. There was ample evidence that, although Mother had engaged in the services offered by DCS, she also failed to benefit from those services. For example, Mother complied with homebased services, yet the evidence shows that she had failed to maintain stable and appropriate housing throughout the CHINS proceedings. There was also ample evidence that her home was inappropriate at the time of the termination proceeding; not only was Mother residing in a temporary

location that did not have a separate bedroom or bed for Child, she was also living with the man whom Child's treatment professionals believed should not be around Child except in the presence of a licensed therapist.

[17] There was also evidence that Mother failed to see the impact that Child's exposure to pornography had on Child. Mother herself informed DCS that Child may have had access to pornography in the home in which she resided with Stepfather in the past, but Mother was still unconcerned about Child living with Stepfather in the future. However, even assuming the court's finding regarding pornography is clearly erroneous, the decision of the trial court is supported by the remainder of the findings and the portion challenged by Mother may be treated as surplusage. *Lasater v. Lasater*, 809 N.E.2d 380, 397 (Ind. Ct. App. 2004). Moreover, Mother has shown no prejudice from the finding regarding pornography that would warrant reversal of the court's judgment on appeal. *Id.*

## *Best Interests*

[18] In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v. Ind. Dep't of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Ofc. of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an

important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d at 224.

[19]  Again, Mother's contentions on this issue amount to requests that we reweigh the evidence, which we will not do. The trial court found Mother had failed to protect Child, was unable to appreciate the impact of Stepfather's battery of Child, and was unable to provide "safe, suitable or stable home environment." Appellant's App. at 32. Those findings are not clearly erroneous, as there was ample evidence that Mother did not have suitable housing for Child at the time proceedings were initiated, during the proceedings, or at the termination hearing. There was also evidence that Mother intended to have Child live with her and Stepfather, even though all of the professionals treating Child said that it would be harmful to Child to live with Stepfather or have any contact with Stepfather other than visitation supervised by a licensed therapist.

[20]  The professionals treating Child testified that Mother did not have appropriate, stable housing for child at the time of the termination hearing and that Child should not be around Stepfather. Yet Mother stated she intended to have Child living with her and Stepfather for the foreseeable future, and she that she intended for Child to live in a one-room studio apartment at an extended-stay hotel without her own bedroom or bed. This led Child's GAL to testify that termination of Mother's parental rights is in Child's best interests. Given the testimony of Child's treatment professionals, in addition to evidence that Child needs permanency and stability that Mother cannot provide, we hold that the

totality of the evidence supports the trial court's conclusion that termination is in Child's best interests. The trial court did not err when it terminated Mother's parental rights to Child.

[21] Affirmed.

May, J., concurs.

Bailey, J., dissents with separate opinion.

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of: | |
| A.K.G. (Minor Child), | Court of Appeals Case No. 02A03-1608-JT-1869 |
| and | |
| S.M.H. (Mother), | |
| *Appellant-Respondent,* | |
| v. | |
| The Indiana Department of Child Services, | |
| *Appellee-Petitioner.* | |

**Bailey, Judge, dissenting.**

[22] Our Indiana Supreme Court has succinctly stated:

> Few liberties are as central to our society as the right of parents to raise their children. Our General Assembly has thus set a high bar for terminating parental rights – requiring a termination petition to allege four defined elements and commanding dismissal when DCS fails to prove each element by clear and convincing evidence.

*In re Bi.B. and Br.B.*, No. 54S01-1612-JT-630, slip op. at 1 (Feb. 17, 2017). I cannot agree that the "high bar" was met in this case.

[23] I acknowledge that a judgment terminating parental rights will be set aside only if it is found to be clearly erroneous. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). However, the reviewing court may also consider the statutory requirement that in a proceeding to terminate parental rights, the findings must be supported by clear and convincing evidence. *Id.* Thus, we review the judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* Termination of parental rights is a "last resort" to be implemented when all other reasonable efforts have failed. *Id.* at 631. Here, if there was a "failure of all other reasonable efforts," it was because the DCS set the measure of success at an unrealistic bar. A single mother, capable of working retail or service jobs, was to obtain housing without any dependency upon her former spouse, who had shown very poor judgment in the past but made extra-ordinary efforts to atone.

[24] Sometime before the November 5, 2012 CHINS petition was filed, Stepfather intervened in a sibling argument and struck Child in the face, leaving a mark. Stepfather was charged with battery and made subject to a no-contact order as to Child. He later pled guilty to the battery charge and was given a two-year sentence, suspended to probation. Mother and Stepfather twice violated the no-contact order. Admittedly, this is not appropriate parental behavior.

[25]     In the following three years before the termination decision, Stepfather paid his debt to society and took parenting classes and anger management classes in prison. Upon his release, he immediately began taking steps toward a goal of co-parenting Child. He requested, and received a DCS referral for, individual mental health counseling. The slap or strike appears to have been an isolated incident, as Stepfather has no other documented history of violence. Curiously, however, DCS caseworkers steadfastly maintained that Stepfather was not and would not be an appropriate step-parent – even while facilitating counseling. It seems odd to allocate resources toward activities predetermined to be a lost cause.

[26]     Meanwhile, Mother maintained contact with the DCS, was generally compliant[3] with home based services, completed parenting classes, participated in psychological therapy, and obtained employment as a Wal-Mart greeter. She asked to be allowed to have additional services. Nonetheless, Mother was never perceived as having adequately benefitted from services. Marisela Barrientas testified that Mother had been "very diligent" and "very cooperative" except that she did not have "success" in obtaining housing. (Tr. at 170, 172.) Using the same benchmark as the DCS, the trial court reasoned

---

[3] There was some suggestion that Mother had been "non-compliant as of late." (Tr. at 174.) It appears that Mother called DCS to re-schedule services without the 24-hour notice preferred by DCS. In such circumstances, a call – although made – would be noted as a no-call/no-show. I find it significant that Mother does not work in a 9 to 5 position. In retail, she may not always have ample advance notice of schedule changes. It appears that Mother must have been cooperative with her employer's needs, as would be expected by DCS, in that she was receiving more and more hours until she was nearly full-time as of the termination hearing.

that, despite Mother's efforts, she had not "truly benefitted" from services. (App. at 32.)

[27] In short, Mother achieved compliance with the goals set for her with the exception of obtaining a residence for Child independent of Stepfather. She and Stepfather were residing in a studio apartment, and had obtained funding for a larger unit, but elected not to sign a lease pending the outcome of the termination petition. Admittedly, Mother could not afford a two-bedroom unit from her own employment income; she needed to supplement it with Stepfather's disability income. This circumstance was not likely amenable to change based upon referrals. Simply put, no amount of DCS services and parental cooperation will cause an entry-level retail position to pay enough for a single mother to obtain suitable housing all on her own.

[28] This is not to say that a parent should subject his or her child to danger because an economic contribution is needed. Here, I find it very significant that Mother did not reconcile with Stepfather until AFTER he had completed anger management and parenting classes. Again – if these classes are to no avail – why are there programs funded for incarcerated individuals that are, presumably, on a path to rehabilitation?

[29] As Mother and Stepfather availed themselves of services, Child was moved from foster home to foster home. At the time of the termination hearing, no pre-adoptive home had been located for the pre-teen diagnosed with ADHD

and oppositional defiant disorder. Child wished to maintain a relationship with Mother and Stepfather; Mother and Stepfather wished to parent Child.

[30] Kristen Matheson, M.S.W. ("Matheson"), Child's therapist, testified that Mother was fully cooperative and "supportive" as a parent and that it was "important to [Child] to build a relationship with Mother." (Tr. at 145.) According to Matheson:

> She's always concerned about homework and school and [Mother's] expressed wanting to build a relationship with her daughter and develop more trust with her.
>
> Question: And do you think that's something that needs to happen?
>
> Matheson: I would like to see it happen for [Child's] sake I mean it's important to [Child] she loves her mom.
>
> Question: So obviously if that needs to happen it's not there right now?
>
> Matheson: Correct.

(Tr. at 145.) Clearly, Matheson's goal was sustenance of the parent-child relationship.

[31] Matheson also addressed Child's feelings toward Stepfather. She described an encounter during a joint session with Mother and Child; when Mother inquired as to whether Child was fearful of Stepfather, Child defiantly replied: "I don't give a crap if he smacked me I still love him." (Tr. at 143.) Explaining that

children can remain bonded after abuse but the relationship is complex, Matheson opined that "right now" it was not healthy for Child to be around Stepfather. (Tr. at 147.) I perceive "right now" to be limiting language, not a professional opinion that Child should never be around Stepfather.

[32] Without doubt, Child was traumatized in the past. However, I am not convinced that an isolated incidence of violence is automatically a "last resort" event portending termination of parental rights regardless of the willingness of the parents to do what is reasonably asked of them. Child has not found stability in foster placements. Meanwhile, she is bonded with both Mother and Stepfather and desires relationships with them. They desire to provide a home for Child and have taken significant steps toward that end. Child's therapist described the mother-child interaction approvingly. Nonetheless, despite Mother's remarkable cooperation with services, her benefit from services was assessed in terms of her detachment from Stepfather. Curiously, although the DCS referred Stepfather to therapy, caseworkers appeared to be convinced that Stepfather would always pose a threat to Child. However, after an incidence of violence, Stepfather appeared to pursue all avenues available to him to diminish the probability of such conduct in the future. He took parenting classes and anger management classes, and – at his own initiative – commenced individual therapy. Even Child's therapist did not suggest that Stepfather should be prohibited from all future contact with Child. In sum, the trial court's findings as to Mother's past conduct and her current unwillingness to separate from

Stepfather do not demonstrate clearly and convincingly that termination is in Child's best interests.

[33]     I would find that the evidence in this case does not meet the heightened burden of clear and convincing.