## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 02 2017, 6:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Mark F. James
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

J.P., et al.,

*Appellants-Defendants,*

v.

Indiana Department of Child Services,

*Appellee-Plaintiff*

May 2, 2017

Court of Appeals Case No.
71A03-1610-JT-2441

Appeal from the St. Joseph Probate Court

The Honorable James N. Fox, Judge

Trial Court Cause No.
71J01-1506-JT-70, 71J01-1506-JT-71, 71J01-1506-JT-72

**Altice, Judge.**

## Case Summary

[1] J.P. (Mother) appeals from the trial court's order terminating her parental rights to her three children. On appeal, Mother argues that the trial court's termination order was not supported by sufficient evidence.

[2] We affirm.

## Facts & Procedural History

[3] Mother and C.J. (Father)[1] have three children: L.P, born in 2007; C.P., born in 2008; and K.P., born in 2010 (collectively, the Children). The family first came to the attention of the Department of Child Services (DCS) in March 2009, when L.P. was found outside the house unsupervised. The case was closed after the implementation of a safety plan. Since that time, there have been numerous DCS hotline reports made concerning the family. One such report came in November 2013, in which it was alleged that Mother was smoking marijuana in the presence of the Children and using cocaine, and that the home and the Children were filthy and infested with head lice and bed bugs. A DCS investigation revealed that L.P. had been missing a lot of school due to an ongoing head lice infestation. Additionally, Mother tested positive for THC and cocaine, and the DCS assessment worker had safety concerns due to the Children's extremely unruly behavior and Mother's inability to control them.

---

[1] Although Father's parental rights were also terminated, he does not participate in this appeal. Accordingly, our recitation of the facts is limited to those relevant to the termination of Mother's rights.

As a result of these concerns, DCS and Mother entered into an informal adjustment, which was approved in December 2013.

[4] Very shortly after the informal adjustment was approved, DCS began to receive additional hotline reports concerning Mother's drug use, the condition of the home, and the Children's hygiene. On March 6, 2014, DCS received a report that L.P. had been physically abused. L.P. had marks and bruises on her arms, legs, and back, and she disclosed to a school nurse that Mother and two other adults had beaten her with a belt. During a forensic interview, C.P. also stated that Mother used a belt on the Children as a form of punishment and that he was not allowed to talk to DCS because "he would get into trouble and get a whooping." *Exhibit Volume*, DCS Exhibit A at 12. The Children were placed in foster care and shortly after their removal, L.P. disclosed that her maternal grandfather had sexually abused her and that other adults had taken "nasty pictures" of her at Mother's home. *Transcript* at 94.

[5] DCS filed its petition alleging the Children were Children in Need of Services (CHINS) on March 10, 2014. Following a fact-finding hearing on July 17, 2014, at which Mother failed to appear, the Children were adjudicated CHINS. A dispositional order was entered on August 13, 2014, pursuant to which Mother was ordered, among other things, to maintain contact with DCS, keep all appointments with service providers, participate in supervised visitation, abstain from using drugs and alcohol, and submit to random drug screens.

[6] DCS filed its petitions to terminate Mother's parental rights to the Children on June 15, 2015. An evidentiary hearing was held on May 19 and 20, 2016, at which DCS presented extensive evidence concerning Mother's failure to complete services and address her parenting issues. With respect to substance abuse treatment, Mother had been referred to Oaklawn during the period of informal adjustment, but she was discharged from the program due to poor attendance. Mother began substance abuse treatment at the Center for Positive Change in September 2015, but her attendance was inconsistent and she was unsuccessfully discharged in December 2015. Mother re-entered the program in January 2016, but she was again unsuccessfully discharged for poor attendance and positive drug screens. Mother tested positive for alcohol and synthetic marijuana on multiple occasions throughout the CHINS and termination proceedings.

[7] Between March and October 2014, Mother's attendance at supervised visitation "was not stellar." *Transcript* at 104. Mother cancelled one visit and did not show up for three other scheduled visits. Around October 2014, Mother's visitation stopped abruptly because she had been arrested for armed robbery. Mother served about three months in jail, and ultimately pled guilty and received a four-year suspended sentence. Upon her release from jail in early 2015, Mother resumed supervised visitation. DCS provided additional assistance for Mother, including transportation to visits, and her attendance greatly improved. However, DCS had concerns regarding Mother's ability to supervise the Children during the visits. The Children would often run out of

the room and they frequently became violent with Mother and each other. Mother did not follow through with discipline and the Children did not respect her as a parental authority. Mother ignored the visitation supervisor's instructions and visits were sometimes ended early due to the Children's behavior. Additionally, the Children experienced anxiety and behavioral problems both before and after visits with Mother. Due to the chaotic, violent nature of the visits, Mother's visitation was suspended in August 2016. The Children have not seen Mother since August 17, 2016.

[8] Mother was also referred for home-based therapy and case management. Mother was not compliant with case management services. Mother did not meet with a case manager for an intake assessment until April 2016. Aside from this initial assessment, Mother attended only one meeting with her case manager. Thereafter, Mother cancelled several appointments and did not show up for scheduled appointments. Although Mother attended home-based therapy and made some progress, her therapist was still concerned about Mother's substance abuse and ability to remain sober.

[9] Because Mother disclosed that the Children had been exposed to domestic violence while in her care, Mother was also referred for domestic violence education. Mother attended only twenty-five of forty domestic violence classes, and Mother's fiancé was arrested for domestic battery against Mother just a few weeks before the termination hearing. Although Mother testified that she was no longer planning to marry him, he nevertheless accompanied her to the termination hearing. Mother also testified that her fiancé was involved in the

robbery she committed in October 2014. Mother had recently admitted to violating her probation in that case and was set to be sentenced for the violation the next week.

[10] Evidence was also presented concerning the progress the Children had made since their removal. When the Children were first placed in their foster home in March 2014, they had serious behavioral problems, including defiance and physical aggression. L.P. would make herself vomit and exhibited self-harming behavior, and she had a lot of anxiety about whether she would have enough food to eat. L.P. was also behind in school. C.P. was very destructive and aggressive toward others, including his teachers. He would often say that he was a "gangster" or "thug", and his play was based on a "gang mentality" and "killing people and shooting the cops[.]" *Id.* at 42. K.P. had nightmares and would wake up screaming every night. She also stole things, exhibited self-harming behavior, and was very bossy and controlling with other children. The Children have also acted out sexually, and C.P. disclosed that he had observed Mother engaging in sexual acts with her fiancé.

[11] Since their removal, the Children have been going to therapy and working with a behavioral clinician and a foster care support specialist. All three of the Children have been diagnosed with post-traumatic stress disorder and oppositional defiant disorder, and all three have been prescribed medication to help manage their symptoms. Their behavior has improved dramatically with these services. The Children's behavior also improved after the visits with Mother were stopped. However, all three of the Children had a "melt-down"

after receiving a card from Mother shortly before the termination hearing. *Id.* at 158. K.P. was aggressive and defiant at school, C.P. "destroyed his classroom", and L.P. cried and was withdrawn. *Id.* at 159.

[12] At the conclusion of the evidentiary hearing, the trial court took the matter under advisement. The trial court issued its order terminating Mother's parental rights to all three of the Children on September 26, 2016. Mother now appeals.

## Discussion & Decision

[13] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.* Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[14] The trial court entered findings in its order terminating Mother's parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the

record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[15] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.,* 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[16] Mother first argues that a number of the trial court's findings are not supported by the record. Mother challenges the following specific findings:

> 9. Mother appeared to be under the influence of some drug during the trial;

> 10. Mother appeared to be having difficulty staying awake;

> 11. Mother was inappropriately lifting and adjusting her blouse prior to the trial;

12. Father is not incarcerated and has failed to comply with the orders of the Court;

13. The Court finds that father and paternal grandfather ask why placement was not with paternal grandfather;

14. Paternal grandfather lives in Michigan;

15. Paternal grandfather has only contacted DCS within the last few weeks to inquire about placement of the child[ren] with him;

16. Paternal grandfather has never spoken or contacted DCS during the pendency of these matters until recently;

17. Paternal grandfather had not contacted father while he was incarcerated to find out how to contact DCS[.]

*Appellant's Appendix* at 36.

[17]   Findings number 12 through 17 address issues pertinent to Father and to the placement of the Children with their foster mother rather than their paternal grandfather, which Mother does not challenge. To the extent these findings are unsupported by the record, they had no impact on the trial court's judgment terminating Mother's parental rights. The only challenged findings pertinent to Mother are findings number 9 through 11. These findings reflect the trial court's in-court observations of Mother's demeanor, and as the finder of fact, the trial court was permitted to make such findings. As an appellate court reviewing a paper record, we are not in a position to second-guess such direct observations. In any event, after reviewing the evidence presented in this case,

we are satisfied that the trial court's findings concerning Mother's in-court demeanor did not contribute significantly to its decision to terminate Mother's parental rights. *See Lasater v. Lasater*, 809 N.E.2d 380, 398 (Ind. Ct. App. 2004) ("Findings, even if erroneous, do not warrant reversal if they amount to mere surplusage and add nothing to the trial court's decision.").

[18] Mother also argues that the evidence was insufficient to support the trial court's ultimate judgment terminating her parental rights. Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D).

[19] Mother challenges the trial court's findings as to subsection (b)(2)(B)(i) and (ii). We note that DCS was required to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the trial court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003). Here, the trial court found that DCS presented sufficient evidence to satisfy two of those requirements, namely, that there is a reasonable probability the conditions resulting in the Children's removal or continued placement outside Mother's care will not be remedied and that the continuation of the parent-child relationship poses a threat to the Children's well-being. *See* I.C. § 31-35-2-4(b)(2)(B)(i), (ii). We focus our inquiry on the requirements of subsection (b)(2)(B)(i)—that is, whether there was sufficient evidence to establish a reasonable probability that the conditions resulting in the Children's removal or continued placement outside Mother's care will not be remedied.

[20] In making such a determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* In making this determination, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.

The court may also consider the parent's response to the services offered through DCS. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210.

[21]     Additionally, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Although a trial court is required to give due regard to changed conditions, this does not preclude a finding that a parent's past behavior is the best predictor of his or her future behavior. *Id.*

[22]     On appeal, Mother focuses solely on whether the conditions leading to the Children's initial removal in March 2014—physical abuse—have been remedied. According to Mother, there is no indication that the physical abuse continued after the Children were removed. This argument misses the point. It is of course true that Mother and other adults in Mother's life did not continue to abuse the Children after their removal because there was no opportunity for them to do so. However, given that Mother has not fully participated in

services, it was within the trial court's discretion to conclude that such abuse was likely to recur if the Children were returned to Mother's care.

[23] Moreover, the language of Indiana's termination statute makes it clear that it is not only the basis for a child's removal that may be considered, but also the reasons for the child's continued placement outside of the home. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Although physical abuse of L.P. formed a significant part the basis for the Children's removal from the home, the Children's continued placement outside the home was based on a number of factors, including Mother's ongoing substance abuse and failure to complete substance abuse treatment, Mother's criminal involvement, the Children's exposure to domestic violence in the home and Mother's failure to complete domestic violence education, Mother's inability to control the Children and ensure their safety during visits, Mother's failure to ensure that L.P. attended school, Mother's inappropriate sexual behavior in the presence of the Children, and sexual abuse occurring in Mother's home. In light of Mother's failure to participate in services, her ongoing substance abuse, domestic violence occurring just weeks before the termination hearing, and the impending potential revocation of Mother's four-year suspended sentence, the trial court's finding that there was a reasonable probability that the conditions leading to the Children's removal and continued placement outside Mother's care would not be remedied is amply supported by the evidence.

[24] Mother also argues that the evidence was insufficient to support the trial court's finding that termination was in the Children's best interests. In determining

whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). In so doing, the trial court must subordinate the interest of the parent to those of the child, and the court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d at 236.

[25] We have already concluded that the evidence is sufficient to support the trial court's finding that the conditions resulting in the Children's removal and continued placement outside Mother's care will not be remedied. We note further that both the family case manager and the court-appointed special advocate recommended termination of Mother's parental rights. This is sufficient standing alone to support the trial court's finding that termination is in the Children's best interests. We note further, however, that there was significant evidence presented concerning the negative effect contact with Mother had on the Children's behavior.

[26] Nevertheless, Mother directs our attention to the testimony of L.P. and K.P.'s therapist that terminating Mother's parental rights would be "traumatic" for the girls. *Transcript* at 30. Our review of the therapist's testimony, however, reveals that the therapist also indicated that the Children had suffered a number of traumas while in Mother's care. The therapist testified further that many of the girls' issues stemmed from "the unknown", that is, uncertainty concerning the status of their relationship with Mother, and that with ongoing support services, the girls would have the opportunity to process their trauma. *Id.* at 31.

[27] It is inevitable that the termination of parental rights will leave a scar for any child, but it is nevertheless sometimes necessary to protect a child from further abuse, neglect, and trauma. The evidence presented in this case was more than sufficient to support the trial court's finding that termination of Mother's parental rights was in the Children's best interests.

[28] Judgment affirmed.

[29] Kirsch, J. and Mathias, J., concur.