## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 05 2020, 8:56 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

G. Allen Lidy
Lidy Law, PC
Mooresville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of K.A. (Minor Child) and B.A. (Father);

B.A. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services (DCS),

*Appellee-Petitioner*

November 5, 2020

Court of Appeals Case No. 20A-JT-812

Appeal from the Morgan Circuit Court

The Honorable Matthew Hanson, Judge

Trial Court Cause No. 55C01-1909-JT-349

**May, Judge.**

[1] B.A. ("Father") appeals the involuntary termination of his parental rights to K.A. ("Child"). Father challenges a number of the trial court's findings, and he also argues that the trial court's findings do not support its conclusions that the conditions that led to Child's removal would not be remedied and that the continuation of the Father-Child relationship would pose a threat to Child's well-being. We affirm.

## Facts and Procedural History[1]

[2] Child was born to J.G. ("Mother") on August 28, 2018. Child tested positive for "THC, fentanyl, codeine, Tramadol, and morphine" at birth. (App. Vol. II at 44.) Mother admitted using heroin and cocaine in the past. She also told the Department of Child Services ("DCS") that she used unprescribed Percocet and marijuana while pregnant. Father, who was required to wear an ankle bracelet "due to possession charges[,]" was found "in the hospital cafeteria vomiting with a syringe in his arm" and was treated at the hospital for an accidental overdose. (*Id.*) After he was treated, police arrested Father because they found his drug paraphernalia in Mother's hospital room.

[3] On August 29, 2018, DCS removed Child from Parents' care and placed Child with a foster family. At some point shortly thereafter, DCS placed Child with his paternal grandmother. On August 31, 2018, DCS filed a petition alleging

---

[1] We remind Father's counsel that Indiana Appellate Rule 46(A)(6)(c) requires the Statement of Facts be in narrative form.

Child was a Child in Need of Services ("CHINS") based on Parents' drug use and Father's incarceration. On October 1, 2018, Mother and Father admitted Child was a CHINS and the trial court adjudicated Child as such. From September 20, 2018, to October 29, 2018, Father was enrolled in a substance abuse treatment program in Florida. Father failed to appear for a hearing in one of his criminal cases on October 22, 2018, and the criminal court issued a warrant for his arrest.

[4] On December 12, 2018, the trial court held its dispositional hearing. Father did not appear. At some point in the winter of 2018, Father returned to Florida to participate in substance abuse treatment, but he left the program after testing positive for illegal drugs. On January 31 or February 1, 2019, Mother died of a drug overdose. On February 2, 2019, police arrested Father on a bench warrant from the possession case stemming from Father's heroin use at the hospital during Child's birth on February 2, 2019. On February 4, 2019, Father pled guilty to Level 6 felony unlawful use of a syringe. The criminal court sentenced him to 365 days in home detention.

[5] On March 13, 2019, the trial court held a review hearing and removed Child from the Child's placement with paternal grandmother because "there were several issues with the placement (paternal grandmother) surrounding [Mother's] life support issues, comments to social workers at the hospital, visitations that were permitted with various non-approved people and/or the parents, and other issues[.]" (*Id*. at 23.) DCS then placed Child with maternal grandmother. On March 13, 2019, the trial court entered its dispositional

order, requiring Father to, among other things: contact DCS, notify DCS of a change in address or employment, notify DCS of any new criminal charges, allow DCS to make unannounced visits to Father's residence, participate in all recommended services, maintain safe and appropriate housing, secure and maintain stable employment, refrain from using illegal drugs or alcohol, submit to random drug screens, complete a parenting assessment, and attend all scheduled visits with Child. On April 1, 2019, DCS placed Child with maternal aunt, where he has remained for the pendency of these proceedings.

[6] After the trial court's dispositional order in the CHINS case, Father completed his substance abuse evaluation and enrolled in the Fatherhood Engagement program as ordered by the trial court. From March 13 until May 28, 2019, Father participated in two supervised visits with Child per week. On March 13 and April 8, 2019, Father tested negative for illegal drugs. He tested positive for THC, morphine, and fentanyl on May 6, 2019, and for morphine and fentanyl on May 20, 2019.

[7] From May 28 through October 4, 2019, Father was in and out of jail for various violations of his home detention placement. At some point in those four months, Father left Indiana without the permission of DCS or his probation officer, reportedly to engage in substance abuse treatment services in Florida. On June 18, 2019, the trial court suspended Father's supervised visits with Child. Because Father was non-compliant with services, on August 15, 2019, the trial court changed Child's permanency plan from reunification to adoption. On September 11, 2019, DCS filed its petition to terminate Father's parental

rights to Child. After his release from incarceration on October 4, 2019, Father began to re-engage in services such as substance abuse treatment and the Father's Engagement program.

[8] In November 2019, Father began group therapy sessions to address substance abuse and parenting skills. The service provider suggested Father participate in a recovery process group prior to the substance abuse and parenting skills group sessions because Father tested positive for illegal drugs. Father did not return to the service provider for the recovery group, substance abuse group, or the parenting group. On November 4, 2019, he tested positive for THC and cocaine. Father continued his participation with Fatherhood Engagement. On November 21, 2019, Father tested positive for THC and cocaine. Father did not complete some requested screens in December 2019. Father did not complete some of the requested screens in January 2020.

[9] The trial court held fact-finding hearings on DCS's termination petition on February 27 and March 4, 2020. On March 8, 2020, the trial court entered its order terminating Father's parental rights to Child.

# Discussion and Decision

[10] We review termination of parental rights with great deference. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge the credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable

inferences most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[11] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* A juvenile court must subordinate the interests of the parents to those of the child, however, when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own child should not be terminated solely because there is a better home available for the child, *id.*, but parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[12] To terminate a parent-child relationship in Indiana, DCS must allege and prove:

> (A) that one (1) of the following is true:
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
> (iii) The child has been removed from the parent and has been under the supervision of a county office of

family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

    (B)    that one (1) of the following is true:

        (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

        (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

        (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

    (C)    that termination is in the best interests of the child; and

    (D)    that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. "[I]f the State fails to prove any one of these statutory elements, then it is not entitled to a judgment terminating parental rights." *Id*. at 1261. Because parents have a constitutionally protected right to establish a home and raise their children, the State "must strictly comply with the statute terminating parental rights." *Platz v. Elkhart Cty. Dep't of Pub. Welfare*, 631 N.E.2d 16, 18 (Ind. Ct. App. 1994).

# 1. Challenged Findings

[13]    When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of*

*Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208. Unchallenged findings "must be accepted as correct." *Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992). Father challenges a number of the trial court's findings.

### A. Findings Regarding Father's Drug Screens

[14] Father challenges five findings regarding the drugs screens required of him as part of the trial court's dispositional order. Regarding the outcomes of his drug screens, Father challenges the following findings:

> 121. That [Father] missed several drug tests in October, which were deemed positive, failed two others and passed two others.

> \* \* \* \* \*

> 140. That on both 12/11 and 12/17 [Father] had positive drug screens for THC and simply failed to show up for any other screens.

> \* \* \* \* \*

> 143. That [Father] had positive drug screens on 1/14 for Cocaine and THC, on 1/20 for THC and on 1/23. [Father] failed all other screens for simply not showing up and was negative for the two he did appear for.

144.  That [Father] was negative for drugs on the two screens he took in February of 2020.

(App. Vol. II at 29-31.)  Father contends these findings are not supported by evidence in the record.

[15]  Regarding Father missing drug screens, the family case manager testified Father missed drug screens, but she did not give any specific dates that those screens were missed.  (*See* Tr. Vol. II at 12) (when asked if Father missed drug screens, family case manager answered in the affirmative).  DCS concedes "[i]t is unclear from the record where the trial court obtained this information[.]"  (Br. of Appellee at 20.)  Nevertheless, there were several other unchallenged findings regarding Father's drug use.

[16]  Father does not challenge the following findings regarding his drug use:

> 8.  That the main reasons for filing [the CHINS] petition were based upon drugs found in [Child's] system at birth and both parents' use of illegal substances.
>
> 9.  That in addition to these issues, at the hospital where [Child] was born, [Father] had an overdose on drugs and eventually ended up in Marion County Jail.
>
> * * * * *
>
> 15.  That a hearing [on the CHINS petition] was held on September 21, 2018 at which [Father] did not appear as he had apparently been released from jail and had flown to Florida to seek drug treatment.

* * * * *

18. That [Father] filed an affidavit admitting he was father of the [Child], and that he had drug issues and could not care for [Child] due to being out of state in treatment.

* * * * *

59. That it was indicated at one visit [with Child] that the provider believed that [Father] showed signs of intoxication and other providers surmised [Father] may have relapsed.

* * * * *

61. That [Father] had two positive drug screens on May 6, 2019 for THC, Morphine and Fentanyl and again on May 29, 2019 for Morphine and Fentanyl, and he cancelled a meeting with the FCM [family case manager] when she was to meet with him about the screens.

62. That by text [Father] admitted to relapsing.

* * * * *

77. That [at a review hearing on June 18, 2019, during which Father did not appear, but was represented by counsel] the parties discussed [Father's] whereabouts, concerns for his lack of progress on any of the recommendations from this case and the CASA [court-appointed special advocate] raised concerns about [Father's] recent visits where she believed he was clearly under the influence of drugs.

78. That these worrisome visits preceded [Father's] return to the Florida drug treatment facility so it is not a far stretch to find that CASA's concerns and beliefs were likely true in regards with [sic] [Father] being under the influence of drugs at the visits.

79. That showing up high to visits is a clear and apparent danger to [Child].

\* \* \* \* \*

97. That during the month of July [2019] [Father] also avoided taking drug screens.

\* \* \* \* \*

122. That on November 4, 2019 [Father's] drug test was positive for THC and Cocaine.

\* \* \* \* \*

136. That [Father,] the FCM and others testified that [Father] was confronted in November of 2019 with having to drop his IOP [intensive outpatient program] class to attend an "active users" group until he could get clean, and only then return to the IOP class.

\* \* \* \* \*

163. That this case began just two (2) days after [Child's] birth when [Child] was born drug positive and [Father] was arrested and overdosed on drugs.

\* \* \* \* \*

171. Here, however, [Father] was discovered high in the hospital cafeteria, admitted to throwing a needle and spoon with heroin into the bushes and was clearly overdosing on drugs.

172. Therefore, it became apparent quite early in this case that [Father] has a serious drug issue that needed to be addressed.

* * * * *

184. That over the next several months [Father] did eventually complete an assessment, did none of the recommended drug services thereafter, and was eventually back using drugs in the late spring of 2019.

* * * * *

194. That within a matter of days or [sic] reengaging in services [in Fall 2019], however, [Father] failed two (2) more drug tests.

* * * * *

196. That on November 21, 2019 [Father] had a positive test for THC, Cocaine, BZE and EME.[2]

* * * * *

---

[2] Donna McCoy, the certified toxicologist from the laboratory that processed Father's drug screens, testified BZE is "benzoylecgonine . . . a metabolite of cocaine" and EME is "ecgonine methyl ester . . . which is another metabolite of cocaine[.]"  (Tr. Vol. II at 75.)

202. Likewise, [Father] claimed he has been drug free despite simply skipping out on almost all of the drug tests from November to the date of the termination hearing.

* * * * *

212. That in whole, it is clear that [Father] continues to use drugs and has an ongoing drug abuse issue.

(*Id*. at 21-36.) As there are multiple unchallenged findings documenting Father's drug abuse issues, any trial court error created by including findings 121, 140, 143, and 144 was harmless. *See Lasater v. Lasater*, 809 N.E.2d 380, 397 (Ind. Ct. App. 2004) ("To the extent that the judgment is based on erroneous findings, those findings are superfluous and are not fatal to the judgment if the remaining valid findings and conclusions support the judgment.").

[17] Additionally, Father contends Finding 123, which pertains to his drug use, is not supported by evidence. Finding 123 states: "That [Father] had previously admitted to the case worker using several weeks prior to this test [on November 4, 2019]." (App. Vol. II at 29.) However, the family case manager testified Father indicated to her "[d]uring the team meeting in November" that he "does have a problem and does need help." (Tr. Vol. II at 115.) Father's argument is an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge the credibility of witnesses). Finding 123 is supported by the evidence.

### B. Findings Regarding Father's Participation in Services

[18] Father contends two of the court's findings are "directly in conflict[.]" (Br. of Appellant at 20.) He points to Finding 139, which states, "That in December the case worker attempted to engage [Father] in all of the services he was supposed to [be] working [on] but he otherwise did not engage," (App. Vol. II at 30), and Finding 138, which states, "that in December [Father] did become engaged with Fatherhood Engagement." (*Id.*) He also asserts the evidence does not support the finding that his case worker attempted to engage him in December 2019 because she testified that she had only communicated with Father "thru [sic] text messaging and phone calls." (Tr. Vol. II at 129.)

[19] Additionally, with regard to visitation, Father challenges Finding 191, which states "[t]hat [Father's] visitations were suspended completely in June of 2019 until he could show three (3) months of clean screens and reengage in services." (App. Vol. II at 34.) Father does not argue the record fails to support this finding, but instead argues the trial court's order suspending Father's visitation did not include the requirement that he produce three months of negative drug screens and reengage in services.

[20] As an initial matter, Father's arguments are invitations for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge the credibility of witnesses). Further, "under Indiana law, even a complete failure to provide services cannot serve as a basis to attack the termination of parental rights[,]" *Stone v. Daviess Cty. Div. of Children & Family Servs.*, 656 N.E.2d 824,

830 (Ind. Ct. App. 1995), *trans. denied*, and it is well settled that "a parent may not sit idly by without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting." *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000). Thus, Father's arguments regarding the trial court's findings about the services, visitation, and communication during these proceedings fail.

### C. Findings Regarding Court Proceedings

[21] Father challenges a number of findings pertaining to the court proceedings, specifically:

> 114. That while the court could have perhaps defaulted [Father] on the entire hearing, the court chose instead to keep [Father's] denial [of DCS's petition to terminate his parental rights] in place and set up a fact-finding hearing.

> 115. This particular fact finding was set since [Father] had clearly caused delay and had not even appeared at the November 12, 2019 hearing to inform the court of the progress of his search for counsel.

> * * * * *

> 152. This denial [of Father's motion to continue] was based on the fact that this matter had often been delayed by [Father's] actions throughout this case and even once new counsel was finally hired after the start of the termination hearing, just a few days before the main hearing, [Father] fired and hired another new counsel.

153. Simply put, this case had been delayed enough and due to timelines and consideration for permanency, and through the review hearings the court was aware [Father] was not participating in any services anyway making a continuance request seem more [like] another tactic to delay/stall the hearing.

(App. Vol. II at 29, 31.) Father contends Findings 114 and 115 indicate the trial court's "predilection to find against [Father]." (Br. of Appellant at 16.) Similarly, he argues Findings 152 and 153 are further examples of the "the procedure [the trial court] used in ramming this [termination of parental rights petition] through to conclusion [which] strikes at the heart of essential fairness in the litigation process." (*Id.* at 24.)

[22] The record indicates Father refused court-appointed counsel after DCS filed its petition to terminate his parental rights, did not hire private counsel for two months, and then changed counsel again before the termination fact-finding hearing. During the termination proceedings, Father was participating in Fatherhood Engagement, but was not consistently engaged with any other service, including those to address his substance abuse problem. Father's arguments are invitations for us to reweigh evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge the credibility of witnesses). Further, Father has not indicated how the trial court's characterization of the proceedings before it affected his substantial rights, and thus any error in their inclusion was harmless. *See* Indiana Appellate Rule 66(A) (harmless error

occurs when, in light of all of the evidence in the case, the error is sufficiently minor so as not to affect the substantial rights of a party).

### D. Other Challenged Findings

Father challenges Finding 190, which states in relevant part, that he was released from jail on October 28, 2019. He also challenges Finding 233, which states in relevant part that he was released from jail on September 4, 2019. The parties do not dispute that Father was released from jail on October 4, 2019. However, these two clerical errors are harmless because the correct date Father was released from jail is stated multiple times elsewhere in the order. *See S.M. v. Elkhart Cty. Ofc. of Family & Children*, 706 N.E.2d 596, 598 (Ind. Ct. App. 1999) ("When a trial judge makes an erroneous fact finding that is superfluous to the judgement the error does not warrant reversal.").

Father also argues Finding 178, which states "[t]hat within days of arriving at the [rehabilitation] facility [in Florida] [Father] spoke about the corruption of the Indiana DCS system, how his mother was attempting to gain custody of his son[,]" (App. Vol. II at 33), is not supported by the evidence. He maintains the record indicates, "[c]lient informed therapist that his mother feels that she will be able to gain custody of his son soon and that the system up in Indiana is corrupt" (State's Ex. Vol. II at 84), "39 days after he was admitted" (Br. of Appellant at 24), not "within days" of his admission at the Florida rehabilitation facility. Father's arguments are invitations for us to reweigh evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge the

credibility of witnesses). Further, even if the characterization of the time frame in which Father expressed his displeasure with DCS is incorrect, that error does not warrant reversal. *See S.M.*, 706 N.E.2d at 598 ("When a trial judge makes an erroneous fact finding that is superfluous to the judgement the error does not warrant reversal.").

Finally, Father challenges a number of findings that are conclusory in nature:

> 204. That as is clearly evident to anyone reviewing the history of this case [Father] refuses to accept any path to redemption other than his own.
>
> 205. That from the very start of this case [Father] has always taken his own steps, [has] refused the aid of those trying to help him, and has refused to maintain sobriety for any long period of time.
>
> 206. While some could say that putting yourself into [a] rehab facility back in the fall of 2018 was a positive step, the rehab did not hold, [Father] skipped out on his criminal case which resulted in a warrant and [Father] has refused to let anyone in Indiana assist him with his drug use.
>
> * * * * *
>
> 213. Likewise, it is clear that [Father] refuses to get the help he needs to overcome this addiction and will not seek out this help as it has awaited him since the case started.
>
> 214. It is clear beyond a reasonable doubt that there is a reasonable probability that [Father] has not and will not remedy the drug issues he has faced for over ten years of his life.

* * * * *

241.  Instead [Father] did his own thing, thumbed his nose at the system and the state, and this criminal behavior is one that has been in play for most of his life and continues to this day.

* * * * *

269.  [Father] lacks any ability to care for or provide for [Child] as he has not done so consistently while under the dictates of this case.

(App. Vol. II at 35-40.)  Father contends these findings are irrelevant and conclusory in nature, and that they change the standard under which Father may be reunified with Child from whether Father may remedy the situation which resulted in Child's removal to whether Father can be "redeemed."  (Br. of Appellant at 27.)  Father also argues "there is no requirement that the only path to remedying the situation is through DCS intervention."  (*Id*.)  Further, regarding Finding 269, Father asserts that the trial court's finding attempts to impose a new standard, "to wit: Because the child has been removed from the Appellant the entire time the case was pending, then termination must occur because the Appellant could not provide care and custody for the child during the case."  (*Id*. at 30.)

Father's entire appellate argument, but especially the portion regarding the conclusory findings, meanders and nitpicks at language in the findings that has absolutely no relevance.  He cites very few cases, and those cases he cites are often not on point or properly cited.  At best, Father's arguments regarding the

trial court's conclusory findings are invitations for us to reweigh the evidence or judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge the credibility of witnesses). At worst, they lack cogency and are waived for our review. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (waiving argument for lack of cogency), *trans. denied*. Nevertheless, we hold the trial court did not err in making these findings as they are supported by the record as discussed *supra*.

## 2. Conditions Under Which Child Was Removed Would Not Be Remedied

[27] The trial court found the conditions that resulted in Child's removal would not be remedied. In making such a determination, a trial court must judge a parent's fitness to care for his child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. It must evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.

[28] The trial court may also properly consider, as evidence of whether conditions will be remedied, the services offered to the parent by DCS and the parent's response to those services. *Id.* A trial court need not wait until a child is

irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). Father argues the trial court's conclusion that the conditions that resulted in Child's removal would not be remedied was "not reliable" "based upon . . . the evidence actually introduced at the TPR Trial." (Br. of Appellant at 30.)

[29] The trial court entered a plethora of unchallenged findings that support its conclusion that the conditions that resulted in Child's removal would not be remedied, including:

> 95. The DCS caseworker quite accurately points out in the report that [Father] has continued to make excuses, essentially lie, and continue to put off any work towards services in this case.

> 96. The DCS caseworker reset several meeting times at [Father's] requests, however he most often did not show up for those meetings.

> \* \* \* \* \*

> 98. That in July [2019] [Father] began to accuse the caseworker and others involved of lying and essentially making up things about him.

> \* \* \* \* \*

135. That at the end of November [2019] [Father] ceased all services with Centerstone [the service provider for substance abuse rehabilitation services].

136. That [Father], the FCM and others testified that [Father] was confronted in November of 2019 with having to drop his IOP [Intensive Outpatient] class to attend an "active users" group until he could get clean, and only then return to the IOP class.

* * * * *

141. In January [2020] [Father] continued to work with fatherhood engagement, however since he was not seeing [Child], the meetings focused more on support and advice during the pending termination proceedings.

* * * * *

157. Initially it should be stated that at no time in [Child's] life has he ever lived with [Father].

* * * * *

177. Father admitted to the [Florida rehabilitation] facility that he had been abusing drugs since age 16, was willing and ready to change, was willing to get involved in the 12 step programs and find sponsors, admitted to a long history of legal troubles and violence, and had clear control issues.

* * * * *

180.  It should be noted this [Florida rehabilitation] facility was not approved for services by the DCS and until late December [2018] the DCS did not even know where [Father] was located while in Florida.

* * * * *

209.  That [Father] has refused to utilize any consistent treatment or help from the DCS to overcome his drug addiction which is as prevalent today as it was when this case started.

* * * * *

215.  Second, [Father] has issues with criminal activity.

* * * * *

237.  That this case started with criminal behaviors and such behaviors have continued over the life of this case.

238.  That [Father] showed a complete inability to tackle his legal issues, chose to remove himself from the state on two occasions knowing he was not to leave, and continued to violate the simple dictates placed upon him by community corrections without regard for the rules.

239.  That [Father] admitted to a long history of criminal behaviors and although this most recent criminal charge in Marion County is just one of several, the behaviors by [Father] show a complete disregard for authority or the law.

240.  That [Father] was given chance after chance, perhaps even more chances than this court has ever seen in a criminal case, to

get out on the streets, seek help and find a direction other than a criminal one.

* * * * *

249.  Overall, however, it is clear [Father] lacks any real stability and has not had an ability to have a home or hold a job over the duration of this case and up until months after the termination case was filed.

250.  That despite this recent alleged stability at home and work, [Father] has refused to return to any of the DCS services available to him to fix all of the issues in his life.

* * * * *

256.  Whether due to a complete lack of maturity, being emboldened by others that did not insist [Father] get a home, job or treatment, or by simply not having a care [sic] to see the real dangers here, [Father] cannot seem to remedy his complete lack of stability and ability to care for himself, let alone a young child.

(App. Vol. II at 27-39.)  The trial court's unchallenged findings about Father's drug use, noncompliance with services, criminal behavior, and lack of stability are sufficient to support its conclusion that the conditions that resulted in Child's removal would not be remedied.[3]  *See In re G.M.*, 71 N.E.3d 898, 908

---

[3] Father also argues the trial court's findings do not support its conclusion that the continuation of the parent-child relationship posed a threat to the well-being of Child.  However, as the trial court's findings supported its conclusion that the conditions under which Child was removed would not be remedied, we need not address that argument.  *See In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999) (because statute written in

(Ind. Ct. App. 2017) (affirming the trial court's conclusion that the conditions under which child was removed from mother's care would not be remedied based on mother's continued drug use and noncompliance with services).

# Conclusion

With the exception of Findings 121, 140, 143, and 144, the findings Father challenges were supported by evidence, the findings were superfluous, or his challenge thereto was waived. Regarding Findings 121, 140, 143, and 144, the trial court's inclusion of findings not seemingly supported by evidence was harmless because there existed several other unchallenged findings to demonstrate Father's drug use. Additionally, the trial court's findings support its conclusion that the conditions that resulted in Child's removal would not be remedied. Accordingly, we affirm the involuntary termination of Father's parental rights to Child.

Affirmed.

Riley, J., and Altice, J., concur.

---

disjunctive, court needs to find only one requirement to terminate parental rights), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).